[Crim. No. 7825.   In Bank.   July 12, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT LEE NYE, Defendant and Appellant.

168

Vincent Hallinan, Carl B. Shapiro, Patrick Sarsfield Hallinan and LeRoy W. Rice for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Defendant was found guilty after jury trial of murder of the first degree, and the penalty was fixed at death. Thus his appeal automatically comes before this court pursuant to section 1239, subdivision (b), of the Penal Code.

Defendant does not question that the victim met her death at his hands on January 9, 1963. His primary contention is that the killing, in view of the circumstances, did not constitute murder in the first degree, and that several errors which occurred in the guilt phase of the trial require reversal. He further urges error in the penalty phase of the trial.

As to this latter contention the People concede error in the admission of evidence concerning practices of the Adult Authority, argument of counsel and instructions of the court to the jury relating to the possibility of parole for those felons committed for life. Accordingly, the judgment must be reversed insofar as it relates to the penalty. (*People v. Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33].)

The relevant facts are briefly these: On January 1, 1963, the defendant, then 20 years of age, met Susan Doctors, the daughter of his victim. After a short conversation he was given her telephone number, and a few days later he called and made arrangements to visit Susan at her home. During this visit he met Mrs. Doctors.

On January 9, defendant again went to the Doctors' residence. What transpired on that date is known only from the physical evidence and the testimony of defendant. He testified that Mrs. Doctors was alone in the house upon his arrival; that he was admitted and offered a cup of coffee; that a long conversation took place in the kitchen concerning his request to be allowed to date with Susan; that, after he had volunteered information concerning various aspects of his experiences and life, Mrs. Doctors denied his request; that during the course of his declaration and pleading that Mrs. Doctors' attitude was unfair, she requested on several occasions that defendant leave the premises; that he refused

to do so in spite of her declaration that she was going to telephone the police or her husband; that during this conversation Mrs. Doctors had been cleaning kitchen utensils with a hunting knife; that she suddenly ran toward the telephone, near which he was sitting, with the hunting knife in her hand; that he arose and seized her; that he remembers nothing from that time until he found himself standing over the then dead Mrs. Doctors; that he then changed from his bloody clothing into clean clothing belonging to Mr. Doctors; that he took money and jewelry from the Doctors' bedroom in order to expedite his escape; that he then decided to make it appear that the killing had occurred during the course of a rape, and to this end he pulled down around her ankles the ''capri pants'' and underclothing worn by Mrs. Doctors and then fled. The prosecution's physical evidence did not contradict this testimony, but the prosecutor sought, largely through cross-examination, to weaken it as it related to defendant's intent and state of mind.

The People's evidence was to the effect that Mrs. Doctors had been stabbed 37 times, 30 of the wounds being independently adequate to cause her death. There was a mass of circumstantial evidence connecting defendant with the killing. Such evidence consisted, in part, of his bloody fingerprints near the body, his fingerprints and bloody shoe prints throughout the house, his discarded clothing containing smears of blood of the same type as his victim's blood, a knife, concealed in a room occupied by defendant, which could have been the murder weapon and contained evidence of human blood of the victim's type. The knife was not the one with which the victim had been cleaning kitchen utensils, according to defendant's account. Furthermore, a knife sheath found beside the body did not belong in the Doctors' household.

There was substantial evidence from which the jury might properly have found that the deceased had been sexually attacked by defendant at the time of the killing. The body lay on its back, the capri pants and undergarments had been pulled down to the ankles and the upper legs were spread apart. There were smears of blood of the victim's type around and on the inside of the fly of the trousers, on the front of the shorts and on the lower part of the jacket worn by defendant. The blood stains on the victim appeared to be either smeared or wiped in and around her pelvic area, and there were also smears and markings in the very extensive

blood stains on either side of her body, including defendant's right palm print about 5 inches from the left hip. Other fingerprints which could not be lifted were found in the blood around the body. Pubic hairs were found on the floor between the outspread legs.

Numerous items were missing from the home, including the victim's wallet, containing approximately $50 in cash, three wrist watches, earrings, rings, pendants and other jewelry having a value in excess of $3,000, and clothing. Many of the missing items were traced to defendant through the testimony of prosecution witnesses.

The prosecution also introduced extrajudicial statements made by defendant wherein he admitted that he had visited the Doctors' home on the day of the killing, had a conversation with Mrs. Doctors concerning Susan, ransacked the home while Mrs. Doctors was absent for a short while, and left after her return and further uneventful conversation. The circumstances under which these statements were given, and the effect of their admission will be discussed later.

Defendant contends, among other things, that the trial court abused its discretion when it allowed the prosecution to introduce over objection pictures he describes as ''monstrous'' and ''blown up almost to full size of the nude body of the decedent as well as the whole gory scene of the killing.'' We have viewed the photographs of which defendant complains. They are not pleasing to the eye. They are in black-and-white, and measure 20 by 16 inches. Their relevance to the prosecution's claim that the killing occurred during the course of a rape is clear, for they show, *inter alia,* the position of the body and the disarray of the clothing. The record clearly shows that the trial court, in ruling on the objection to the admission of the pictures after extended argument out of the hearing of the jury, properly weighed the probative value of the photographs against their prejudicial effect (compare *People* v. *Ford,* 60 Cal.2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892]). It does not appear that its determination constituted an abuse of discretion.

Defendant next contends that he was denied a fair trial in violation of the Fourteenth Amendment to the United States Constitution when he was compelled in the courtroom, over his personal objection, to physically demonstrate certain acts claimed to have been done by him after the killing had occurred. The demonstration complained of occurred during cross-examination when the prosecutor asked

that defendant, using first a chair and then a live policeman to represent the body of Mrs. Doctors, show how he pulled down the capri pants and underclothing in order to simulate a rape. For a time defendant took part in this demonstration without objection, but as it progressed he personally objected and refused to proceed. During the course of defendant's expostulations, and exchanges between the court, the prosecutor and defense counsel, the prosecutor remarked in response to defendant's declaration that it bothered him to proceed with the demonstration: "Well, it might occur that Mrs. Doctors was bothered considerably too. I think that the witness should be required to illustrate what he has been telling us, if the Court please."

On another occasion the court stated that the matter was not a dramatic spectacle but a serious affair. Defense counsel agreed that it was serious because a young boy's life was at stake, to which the prosecutor responded: "A life at stake because a young lady's life was forfeited."

On still another occasion where, in spite of the court's order to proceed with the demonstration, defendant refused to do so for the reason of conscience, the prosecutor remarked: "Is that the same conscience that's now bothering you that bothered you at the time that you put your shorts in her blood." The reference to defendant's shorts was consistent with defendant's earlier statement that he had not raped the victim but had arranged the physical evidence to give the appearance that the killing had been committed in the perpetration of a rape.

The frustrated demonstration and the foregoing and other similar remarks by the prosecutor without admonitions are assigned as prejudicial error. While such comments are not to be commended, there is no basis for defendant's claim that the demonstration was sought "not as a means of impeaching the defendant or of achieving justice, but as a means of exposing the defendant to calumny and disgrace." Defendant had testified on direct examination, in furtherance of his account of only a contrived rape, that he had changed from his bloody clothing to clean clothing belonging to the victim's husband, and then had arranged the physical evidence to give the appearance of rape. The record is clear that the prosecutor on cross-examination sought to have defendant demonstrate his position over the body when, as he claimed, he was arranging the victim in order to show that he could not have done so without soiling his clean clothing, the impli-

cation being that the arrangement of Mrs. Doctors' clothing occurred during the course of an actual rape and *before* defendant had changed into clean clothing. Under the circumstances the demonstration had this legitimate purpose, and the resulting scene was not such as to shock the conscience or otherwise deprive defendant of a fair trial.

█ Likewise without merit is defendant's contention that his motion for change of venue because of unfavorable and sensational publicity in the local press should have been granted. The case was widely publicized in both the local (Pasadena) and metropolitan press shortly after the commission of the crime. An article also appeared in the local newspaper the day before jury selection began. However, nothing in the record refutes the trial judge's assessment of local publicity, rendered at the hearing on the motion for new trial, as ''very factual and very fair to both sides of the case.'' Moreover, the jury *voir dire* discloses that, of the 12 jurors and one alternate who replaced a juror during the trial, one had read nothing of the case, eight had read only the coverage at the time of the crime, three had read both the coverage at the time of the crime and that appearing the day before jury selection began, and one had read only the latter article. Each of the 13 stated that he had formed no opinion relative to the merits of the case, and that he had not discussed it with other persons. In view of the foregoing, it is clear that the court did not abuse its discretion by declining to change the place of trial. It is equally clear that there is no merit to defendant's related contention that he was deprived of a fair trial by an impartial jury because of publicity attendant upon the trial.

Defendant next attacks the instructions given and refusal of the trial judge to give other instructions relative to murder of the first degree. Three theories were advanced by the prosecution in support of a first degree conviction: (1) premeditation, (2) felony murder rape, and (3) felony murder robbery. The jury was instructed on each of these theories. Defendant argues that the jury should not have been instructed on premeditation because there was no evidence of premeditated action. He emphasizes that he had met Mrs. Doctors only once and then only through a brief and formal introduction before the day of the killing (cf. *People v. Craig*, 49 Cal.2d 313 [316 P.2d 947]), and that the only psychiatric testimony concerning the matter of premeditation, that of the defense psychiatrist, concluded that the

killing was "performed automatically and reflexly by a defendant who was in a state of disassociation."

A simple answer to defendant's contention is that each of the two instructions on premeditation was given at defendant's request, and for that reason he cannot challenge their propriety. (See *People* v. *Cebulla,* 137 Cal. 314 [70 P. 181]; *People* v. *Bradbury,* 155 Cal. 808 [103 P. 215]; *People* v. *Williams,* 128 Cal.App.2d 458 [275 P.2d 513].) In any event there was ample evidence from which the jury could reasonably conclude that defendant's action was premeditated. Especially significant in this regard is the testimony adduced by the prosecution tending to show that the murder weapon was not the knife used by Mrs. Doctors during the conversation preceding the killing, as defendant claimed, but the second knife brought by defendant with him to the Doctors' residence on the day of the killing.

Defendant also argues that the court erroneously refused an instruction which would have required that the jury, in order to render a verdict of murder of the first degree, agree unanimously upon one or more of the three theories advanced by the prosecution; and that it erroneously gave a contrary instruction. No authority supporting the position urged by defendant has been cited, and we are not persuaded to depart from our decision in *People* v. *Chavez,* 37 Cal.2d 656 [234 P.2d 632], where an identical contention was made. In that case we held at page 671: " '. . . So in this case it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute.' "

Defendant's final contentions relative to the guilt phase of the trial are concerned with the admission of certain statements made to police officers shortly after his arrest. Defendant was arrested in Phoenix, Arizona, on January 21, 1963, for an armed assault in a Phoenix motel room. He told the arresting officers that he was wanted in Los Angeles for murder. Later in the day he was questioned by Los Angeles police officers in Phoenix relative to his activities immediately prior to and during January 9, the day of the killing. He told the officers substantially the same story to which he

later testified at trial, with the conspicuous exception that he did not admit to the killing. He said that he stole and concealed the various articles from the Doctors' house while Mrs. Doctors was absent briefly during their conversation over coffee, but he insisted that she was alive when he left the house. Defendant waived extradition and was taken to Los Angeles, where he was again questioned on January 22, giving substantially the same account of his activities during the relevant period.

Both of these statements were introduced by the prosecution without objection as a part of its case in chief, presumably in order to lay a foundation for a showing of consciousness of guilt if the statements were later shown to be untrue. (See *People* v. *Underwood*, 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]; 3 Wigmore, Evidence (3d ed. 1940) § 821, pp. 241-242.) The officers who related the statements declared that they were freely and voluntarily given. After defendant had recounted on direct examination his then version of Mrs. Doctors' death, the statements served as the basis for a vigorous cross-examination during which the prosecutor sought to show that the inconsistencies between them and defendant's direct examination indicated that defendant was conscious of guilt when the statements were given and that any story told by him was motivated by personal expediency alone.

As defendant introduced no credible evidence contradicting the testimony of the officers that the extra-judicial statements were given voluntarily, we find no merit in defendant's contention that the statements should have been excluded as involuntary.

The further contention that, even if the statements were voluntary, they should have been excluded because defendant was at no time advised by the interrogating officers of his constitutional rights to remain silent and to consult with counsel, is more difficult to resolve. The record supports his claim that he was not advised of his right to remain silent, and there is no evidence as to whether he was at any time advised of his right to counsel, whether he asked to see an attorney prior to giving his statements or whether, if he did so ask, he was denied the opportunity to consult with one.

The evidence is not clear as to precisely when the investigation of the crime began to focus on defendant, or as to the exact nature of the interrogation to which defendant was subjected by the Los Angeles police investigators, but it sufficiently appears that the extrajudicial statements were in-

admissible by virtue of the decision of the United States Supreme Court in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. (*People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] ; *People* v. *Stewart*, 62 Cal.2d 571, 576-582 [43 Cal.Rptr. 201, 400 P.2d 97] ; *People* v. *Lilliock*, 62 Cal.2d 618, 621-622 [43 Cal.Rptr. 699, 401 P.2d 4] ; *People* v. *Davis*, 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142].) ▆ Since this case was tried before the *Escobedo* decision, defendant's failure to object to the admission of the statements into evidence does not preclude his raising the question on appeal. (*People* v. *Hillery*, 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382].)

▆ The more difficult question remains whether the error in admitting defendant's statements resulted in a miscarriage of justice requiring our reversal of the entire judgment. (Cal. Const., art. VI, § 4½; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243] ; *People* v. *Bostick*, 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529].)

The statements made by defendant were exculpatory insofar as the charge of murder is concerned and, it is argued, the error in admitting the statements could not, for that reason, be prejudicial. (See *People* v. *Parham*, 60 Cal.2d 378, 385-386 [33 Cal.Rptr. 497, 384 P.2d 1001].) However, the statements were admitted not as evidence of defendant's conduct, but rather to demonstrate the factors of a consciousness of guilt and a general fabrication of defendant's testimony. Hence the determination of prejudice, if any, must take into account the possible effect which such factors, to the extent that they are attributable to inferences to be drawn from defendant's inconsistencies, may have had on the trier of fact in view of all the evidence. We have concluded, for the reasons which follow, that such factors could not have had a substantial bearing on the jury's deliberations.

In the instant case defendant himself took the stand to testify to the lie of his extrajudicial statements. Unlike the situation in *People* v. *Davis*, 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142], he was not impelled by the improper introduction of a prior confession to testify in order to discount the effect of his prior statements. In fact, his testimony went far beyond the relatively innocent conduct related in his statements. Therefore it must be deemed beyond dispute that he chose to testify in order to discount the very incriminating testimony of the prosecution's witnesses. Accordingly, we cannot exclude his testimony as inseparable

from his improperly admitted statements as in *Davis,* and it is manifest that such testimony alone establishes a consciousness of guilt beyond any reasonable doubt. In this regard defendant testified that, after the killing, he took extensive action to conceal what had actually occurred; that he ransacked the home for any valuables he could find in order to make his escape; that he fled, avoiding possible contacts with police; that he hid some and surreptitiously sold other articles he had taken from the home. Much of the evasive action taken by defendant was corroborated by direct testimony on the part of witnesses for the prosecution. In view of all these circumstances we must conclude that the jury, in determining, if it did, that defendant was conscious of his guilt, would necessarily have made that determination irrespective of whether defendant's false story at the time of his apprehension was placed in evidence.

The further factor inferrible from defendant's inconsistent accounts, going to a fabrication of his testimony generally, is likewise of insignificant weight in view of all the circumstances. While the evidence of first degree murder by premeditation and even felony murder robbery may not be sufficiently conclusive to require a conviction on such theories in the absence of the implications of fabricated testimony on the part of defendant, we are persuaded that the evidence of felony murder rape is of such substance. The only rebuttal evidence going to the rape is that of defendant who concedes that the physical evidence compels a conclusion of rape, but contends that this is so only because he arranged matters to simulate a rape. His testimony in this regard does not merit serious consideration, however.

In the first place, defendant has never given a satisfactory reason why he simulated the rape and thus further incriminated himself, other than to state that women are usually killed in the perpetration of robbery or rape "and it just didn't look right if she wasn't." The decision to simulate the rape, according to defendant, was made not when defendant was reacting automatically as he claimed he was in plunging the knife into the victim's body, but after he had reflected on what had occurred, recognized that he needed assets to finance his flight, and changed into clean clothing. Thus the claim that he then concluded to return to the body to simulate rape is far from persuasive.

Also casting serious doubt on defendant's story is his account that when he returned to the body he first had difficulty in loosening the zipper of the capri pants and then in

pulling down the blood soaked pants and panties to the victim's ankles while she lay, literally, in a pool of blood. He testified that the pants were "skin tight . . . I had a hard time pulling them. It took me about two or three minutes." He said he had to yank at the pants several times: "I fell down almost. I slipped, almost fell in the —— my hand, I caught myself in the blood." He also testified that for a portion of the time he was squatting and on his knees between the victim's blood-stained legs while pulling her garments down. But in spite of the obstacles which he contends to have encountered in this endeavor, the clean clothing into which he had changed immediately before he claims to have simulated the rape was not blood splattered or smeared in any manner whatsoever and, as stated, when the prosecutor asked that he demonstrate how he managed this operation without soiling his clothing he refused to comply.

We are persuaded to the conclusion that the error in admitting defendant's extrajudicial statements was not prejudicial for the reason that, in the absence of the error, it is not reasonably probable in view of the totality of the situation that a result more favorable to defendant on the guilt phase would have been reached. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) Thus the error does not require reversal of the judgment of guilt. (Cal. Const., art. VI, § 4½.)

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., and Dooling, J.,* concurred.

SCHAUER, J.,* Concurring and Dissenting.—I concur in the conclusion that "the error in admitting defendant's extrajudicial statements was not prejudicial for the reason that, in the absence of the error, it is not reasonably probable in view of the totality of the situation [citation] that a result more favorable to defendant on the guilt phase would have been reached." (*People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [12] [299 P.2d 243].) The majority state "Thus the error does not *require* reversal of the judgment of guilt." (Italics added.) (Cal. Const., art. VI, § 4½.) I would state, more accurately, "Thus the error does not *permit* reversal of the judgment of guilt"; indeed, on the defined hypothesis, section 4½ *forbids* reversal.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

178

Neither, I add, does the "error in the penalty phase of the trial" permit reversal of the *penalty* judgment. Here again California Constitution, article VI, section 4½, forbids reversal. This is so for precisely the same reason above articulated in respect to the guilt phase; i.e., "in the absence of the error, it is not reasonably probable in view of the totality of the situation that a result more favorable to defendant on the [penalty] phase would have been reached." (See *People v. Morse* (1964) 60 Cal.2d 631, 652-653 [6a] [36 Cal.Rptr. 201, 388 P.2d 33].)

By reason of the facts above stated, and following the authorities cited, I would affirm the judgment both as to guilt and penalty.

McComb, J., concurred.

Appellant's petition for a rehearing was denied August 11, 1965. Mosk, J., did not participate therein.