[Crim. No. 4868.   First Dist., Div. One.   Jan. 6, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. SELMAN
BRICE, Defendant and Appellant.

Winslow O. Small, under appointment by the District Court of Appeal, and Eisner & Titchell for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Clifton R. Jeffers, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, P. J.—A jury found defendant guilty of first degree burglary. (Pen. Code, §§ 459, 460.) He appeals from the judgment of conviction.

Leon Fields was the proprietor of the Louisiana Market, a small grocery store in North Richmond. On April 9, 1963 at 9:30 p.m. he closed his store for the day and retired to his living quarters in the rear of the store. He locked the front door on the inside, also padlocked it on the outside and put out all the lights except a beer sign. He went to bed at about 9:45 p.m. and shortly thereafter fell asleep.

Fields testified that at about 2 a.m. he was awakened by a noise in the store. He jumped out of bed, armed himself with a pistol and "eased" himself into the store. He saw two men moving and called to them to "Halt." When they kept moving he fired two shots. One of the strangers came towards Fields, saying that he had been hit. Fields saw that he was a Negro. He then marched the intruder at gunpoint to the front of the store where Fields called the Richmond Police Department from a pay telephone. At that point he was able to see the face of the intruder by the light of the beer sign. Later he identified him as defendant.

After Fields completed the call, defendant asked the grocer to let him go and showed him his arm which had "a little blood" on it. Fields added that the intruder asked him to shoot him again and "Kill me because they are going to send me to jail." During this interlude Fields uncocked the hammer on his pistol and defendant immediately "jumped" him. Fields' hand and the gun were knocked upward, crashing against the front store window and breaking it. The two men then engaged in a struggle in the store and eventually outdoors to the front sidewalk. A young man came across the

street and, in response to Fields' plea for help, said that he would telephone the police if Fields would give him a dime. Fields, however, was still attempting to keep defendant from gaining control of the gun, whereupon the newcomer, for no apparent reason, ran from the sidewalk yelling "Turn the boy loose." At this point the second intruder emerged from the store and Fields was hit with a two-by-four on the back of the neck. The grocer never saw his assailant so that he could identify him. Fields "charged toward the street and . . . got loose from" defendant, who along with the second intruder immediately began to flee. Fields called to them to halt and fired a shot at each of the fleeing figures. One man fell; the other, defendant, escaped. Fields then reentered his store to get a drink of water and to put on some clothes.[1]

Shortly thereafter Deputies Young and Burton of the Contra Costa County Sheriff's Department arrived.[2] Their investigation lasted three or four hours during which time they took Fields to the Kaiser Foundation Hospital where the latter identified defendant as his assailant.

Defendant's sister testified that she received a telephone call from him in the early hours of the morning of April 10, 1963. At his request she met him and took him to the Kaiser Foundation Hospital.[3] He told her that he had been shot by Fields. Records of the hospital established that he was admitted as an emergency case at 2:32 a.m.

Shortly thereafter, Richmond Police Officer Patrick Boyle arrived at the hospital in response to a radio call and interviewed defendant in the emergency treatment room about a bullet wound in defendant's right arm. At the trial the officer testified that defendant gave him the following oral statement: That defendant was walking in the vicinity of 23rd and Cutting when two cars drove up, each occupied by about three Negro youths; that the cars were a grey Dodge and a blue Chevrolet; that one of the boys leaned out of a car and said "There he is" whereupon defendant took off, running through

[1] During the struggle Fields had received three bites on his hand, a swollen knee, a "blow" on the neck and a bite on his side. He had suffered no cuts to his feet in spite of the fact that throughout the tussle he was barefooted.

[2] They arrived at approximately 2:13 a.m. on April 10. Apparently Fields had not phoned them directly but had instead called the Richmond Police Department since at 2:03 a.m. the Sheriff's Department had received a call from the Richmond police reporting an incident at the Louisiana Market. In addition, the Richmond police will not act in the area of Fields' store (North Richmond) for they have no jurisdiction.

[3] Hereafter referred to as Kaiser Hospital.

back streets to get away; that, thinking he had lost his pursuers, defendant came out on Cutting Street at a liquor store at which time the two cars again drove up, shooting at him; that they shot at least three times, one shot hitting him in the upper arm; that after walking to a ''pay-phone'' at a nearby service station, opposite the Kaiser Hospital, he telephoned his sister, requesting the latter to take him to the hospital because he was afraid to go in by himself.

Later that same day, April 10, at a time not disclosed in the record,[4] Detective Sergeant Scott of the Contra Costa County Sheriff's Office took a tape-recorded statement from defendant at the county hospital in Martinez. At the time defendant was in a large hospital ward, in which there were several other people but no police officers. At the trial, the sergeant, after having refreshed his recollection from the recording,[5] testified in substance to the following conversation with defendant: That Scott went over to defendant's bed and questioned him about his activities around the time when the burglary at the Louisiana Market occurred and about his wound; that defendant said that earlier that night he had gone to his mother's house and borrowed some money from her; that around 12 o'clock he left his mother's house and went to his girl friend's house in Richmond to return a class ring of hers; that after staying there a short time, he went to his sister's home in Richmond but she was not there; that he then walked over to 21st and Cutting where he waited to catch a bus; that he saw two cars approaching and recognized the people in them; that he refused to identify the people for Sergeant Scott but that one of the occupants had caused him some trouble, had demanded $800 for ''a burning car'' and had previously pulled a gun on defendant; that on the approach of the cars defendant became afraid and ran down Cutting; that he came back onto Cutting and was again seen by the above person and his companions who shouted ''There he is, the fellow that burned the car''; that he fled, at one point falling off a curb and hurting his ankle; that as he ran to the Sonny Boy Market he heard two or three shots; that he got to a phone at 14th or 15th and Cutting and called his sister; that as he was talking to her, he saw that his right arm was

---

[4]Although the testimony does not disclose the time of day, the prosecutor asserted in his closing argument that it was at 3:55 p.m.

[5]After *voir dire* examination, the jury was excused, the recording was played, and court and counsel discussed the admissibility of the tape. Although the record is silent on the point, apparently it was decided that the witness should testify himself to the conversation in lieu of having the tape admitted and played to the jury.

bleeding and thought that he had been shot; that his sister came and took him across the street to the Kaiser Hospital; that defendant had stated at the beginning of the interview that he wanted to go to Los Angeles because he had been in trouble with the Richmond Police Department "earlier in the day" and had resisted attempts to arrest him.

On July 16, 1963, Sergeant Scott took a second tape-recorded statement from defendant at the sheriff's office in Martinez to which Scott had brought defendant from the county jail. At this time defendant was being held in the county jail[6] awaiting trial[7] and *was represented by counsel. Scott admitted that he was aware of the fact that defendant had an attorney of record.* Over defendant's objection,[8] Sergeant Scott testified[9] concerning defendant's statement substantially as follows:

Defendant "had changed his story" from that given Scott at the hospital, the difference being in regard to the events *after defendant left his home.* Defendant related the same incident of officers coming to his home to arrest him and of his leaving without being arrested. However defendant then went to North Richmond where he played pool at a place called "Fred's," betting on pool games and winning $4 from Sloan, who was later killed in front of the Louisiana Market. This group "of six or so" then went across the street to a cafe. Later Sloan told defendant that he wanted to go see Fields, the grocer, who owed him some money and defendant agreed to go with him.

Sometime after midnight defendant, Sloan and two others drove to the Louisiana Market, parking across the street. Sloan got out and went across to the market, disappearing along the side of the store. Upon reappearing, Sloan picked up a rock and threw it at the window of the market, breaking the win-

---

[6]Although the record does not state the exact date when defendant was first incarcerated, it discloses that in a colloquy with the court concerning probation, defense counsel stated that defendant had "been in jail since April."

[7]An information charging defendant with burglary of the Fields' premises on April 10, 1963 was filed May 15, 1963; defendant entered a plea of not guilty on June 3, 1963; counsel was appointed for defendant on May 27, 1963; trial began August 27, 1963.

[8]Defendant objected: "I do not think it was free and voluntary. I think he's been deprived of his rights. I think he's been deprived of his constitutional right to have counsel present after a trial date has been set." The court overruled the objection "unless you have some cases on it," observing that "there may be some ethical question."

[9]The court ruled that the sergeant testify himself since the tape was not sufficiently clear.

dow. At this point defendant and the others alighted from the car and Fields emerged from his store.

A discussion ensued between Fields, defendant and Sloan concerning some money, culminating in an argument between Sloan and Fields about some money the latter owed the former. At this point Sloan reached for Fields, who evasively moved aside and then returned into the store. Upon the announcement by Sloan that Fields had gone to get a gun the two unidentified men disappeared. Upon Fields' return the argument again erupted between all three men. Suddenly defendant grabbed the gun and he and Fields began to wrestle. Defendant was able to pull the trigger of the gun held by Fields, discharging the gun three times. At this point one Powell[10] appeared on the scene and inquired "what was going on?" Upon Fields' reply that defendant was trying to burglarize him, Powell asked if he should call the police—Fields said that he would take care of it himself.

While the struggle for the gun continued between defendant and Fields, Sloan had gotten a stick, striking Fields over the shoulders. The latter fell to the ground but held onto the gun as both defendant and Sloan started to flee. Looking back over his shoulder defendant saw Fields getting up—moments later he heard two shots ring out and Sloan fell, mortally wounded. Defendant continued to run, from North Richmond to South Richmond to the area of 14th and Cutting where he placed a telephone call to his sister. He noticed that his right arm was bleeding and thought that he had been shot. He then went to the hospital.

Scott further testified that he asked defendant about his previous statement in which he denied being in the area of the market at the time of the burglary. In reply, defendant stated that he had lied to avoid implicating "seven or eight other people" and also because Fields owed him money.

Defendant took the stand in his own behalf and testified to an account of his activities which was substantially the same as that given in his statement of July 16, 1963 to Sergeant Scott.[11]

Defendant's sole contention on this appeal is that the trial

---

[10]Although called Power by the witness Scott, this man was actually Ronnie Powell, a witness for defendant.

[11]Defendant stated that he was in the pool hall from 9 p.m. to midnight on April 9, 1963; that the group left for Fields' store "around 12:00 or 1:00 o'clock"; and that he grabbed Fields' gun to try "to pull the trigger to shoot the bullets out. . . ."

court committed prejudicial error in admitting in evidence the three statements which he gave to the officers. As to the statement made to Officer Boyle and the April statement made to Sergeant Scott, such error is asserted on the basis of the rule announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and followed in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; as to the July statement made to Scott, error is based on the authority of *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246].

We consider together the statement to Boyle and the April statement to Scott. In bare essence they represent an account of defendant's activities at about the time of the burglary which precludes any participation or involvement on his part in that crime. Apparently they were introduced to show not only their inconsistency with defendant's third statement, and thus the falsity of one or more of all three, but also to lay a foundation in the event that the first two statements were otherwise later shown to be untrue, thereby in any event establishing defendant's consciousness of guilt and a general fabrication of his testimony. (*People* v. *Nye* (1965) 63 Cal.2d 166, 175 [45 Cal.Rptr. 328, 403 P.2d 736].) Contrary to the Attorney General's claim, the first two statements do not fall outside the protection of the *Escobedo-Dorado* rule merely because when considered by themselves, they are exculpatory in character and, if believed, would have exonerated defendant from guilt. (*People* v. *Williams* (1965) 63 Cal.2d 452, 460 [47 Cal.Rptr. 7, 406 P.2d 647]; *People* v. *Nye, supra; People* v. *Hillery* (1965) 62 Cal.2d 692, 712-713 [44 Cal.Rptr. 30, 401 P.2d 382].)[12] As was said in *People* v. *Underwood* (1964) 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]: "A prior statement, although exculpating in form, may prove highly incriminating at the trial because, upon a showing of its falsity, it can constitute evidence of consciousness of guilt. (See 3 Wigmore, Evidence (3d ed. 1940) § 821, pp. 241-242.)"

---

[12]In *Williams, supra,* the court reversed on other grounds but anticipated the likelihood on retrial of defendants' objections that their extrajudicial statements were inadmissible under *Escobedo* and *Dorado,* stating: "Defendants are not foreclosed from objecting to the introduction of their statements because those statements were, or tended to be, exculpatory. (*People* v. *Nye* (1965) 63 Cal.2d 166 [45 Cal.Rptr. 328, 403 P.2d 736]; *People* v. *Hillery* (1965) 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382].) Any implications to the contrary in *People* v. *Ulibarri* (1965) 232 Cal.App.2d 51, 55-56 [42 Cal.Rptr. 409], and *People* v. *McDowell* (1965) 234 Cal.App.2d 54, 61-62 [44 Cal.Rptr. 79], are disapproved." (Fn. 8, 63 Cal.2d at p. 460.)

▮ Nevertheless, we are satisfied that the two statements in question do not fall within the *Dorado* rule for another reason. The record herein fails to show that defendant was in custody at the times he made the statements. When defendant made the first statement to Officer Boyle on April 10 at about 2:30 a.m. he was in the emergency treatment room of Kaiser Hospital to which he had gone voluntarily with the aid of his sister. When he made the second statement to Sergeant Scott in the afternoon of the same day, he was in a ward of the county hospital at Martinez, with other patients but with no police officers in attendance to give rise to the inference that he was under guard or detention. (Cf. *People* v. *Price* (1965) 63 Cal.2d 370, 375 [46 Cal.Rptr. 775, 406 P.2d 55].) For the exclusionary rule of *Dorado* to become operative, it is required, among other things, that the suspect was in custody at the time he made the statements sought to be excluded. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 347, 353.) In respect to the second statement, defendant argues that he was bedridden at the county hospital and that this circumstance "was tantamount to his being in custody." No authority is cited for such a proposition and we find no merit in the point. Defendant's further speculation that "In all probability the police had taken security measures to insure that appellant would not escape" is without any basis in the record. We therefore conclude that the admission of defendant's first two statements did not contravene the rule announced in *Dorado.*

We turn to defendant's third statement which he made to Sergeant Scott at the sheriff's office in July 1963. It was tape-recorded, as was the previous statement which Scott took from defendant at the county hospital in April 1963. However, as already noted (see fn. 9, *ante*), Scott's testimony as to what defendant said, rather than the tape itself, was received in evidence. The record shows that the statement was clearly and tellingly incriminating. During this second interrogation by Scott, defendant not only admitted that he had lied to the sergeant at the first interview at the county hospital about his activities on the night in question but he also for the first time placed himself at the scene of the crime and revealed a direct, personal and physical involvement with Fields. The effect of the third statement was not merely to enmesh defendant in contradictory accounts of his activities and to thereby provide an additional basis for establishing his consciousness of guilt and a fabrication of his answers. Whereas he had previously denied to Scott being anywhere in the Louisiana Market area, he now admitted being present at the critical time and place

and, while not indicating that he had entered the store, disclosed that he had in some way participated in the events leading up to the shooting.

The respective positions of the parties as to the admission of this evidence are as follows: Defendant contends that it constitutes reversible error on the authority of *Massiah* v. *United States, supra,* 377 U.S. 201 because it appears from all the circumstances that Scott, in the absence of defendant's counsel, was attempting to elicit incriminating statements from him. The Attorney General contends that *Massiah* is not applicable at all, since its holding rested upon the *surreptitious* obtaining of incriminating statements whereas in the instant case no surreptitious method was employed and nothing suggests "that appellant was not fully aware that he was talking to a law enforcement agent."

In *Massiah,* the defendant was indicted for violating the federal narcotic laws, retained an attorney, pleaded not guilty and was released on bail. While Massiah was free on bail, a federal agent arranged with his codefendant Colson, who had indicated a willingness to cooperate with the government agents, to have installed in Colson's car a radio transmitter by means of which the agent, parked some distance away in a car equipped with a receiving device, could overhear conversations in Colson's car. Massiah was engaged by Colson in a lengthy conversation in the latter's car during which conversation he made several incriminating statements. By prearrangement with Colson, and totally unbeknown to the defendant, the agent listened to the entire conversation. At the trial, over the defendant's objection, the agent testified to the incriminating statements.

Reversing the conviction, the Supreme Court referred to its opinion in *Spano* v. *New York* (1959) 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265], overturning a New York state conviction because of the erroneous admission in evidence of a confession obtained from the defendant as a result of interrogation at a police station after his indictment and surrender by his attorney who had cautioned him to answer no questions. The Supreme Court observed in *Massiah* that while in *Spano* "the Court's opinion relied upon the totality of the circumstances under which the confession had been obtained, four concurring Justices pointed out that the Constitution required reversal of the conviction *upon the sole and specific ground that the confession had been deliberately elicited* by the police

after the defendant had been indicted, and therefore at a time when he was clearly entitled to a lawyer's help.''[13] (Italics added.) (377 U.S. at p. 204.)

The court in *Massiah* proceeded to the further observation that a number of New York decisions[14] subsequent to *Spano*, including *People* v. *Waterman* (1961) 9 N.Y.2d 561 [216 N.Y. S.2d 70, 175 N.E.2d 445], from which it quoted,[15] followed the constitutional rule that the guarantee of aid of counsel to an indicted defendant *at trial* extended to such indicted defendant while under police interrogation in a completely *extrajudicial proceeding* (see fn. 13, *ante*), thus giving recognition to a constitutional principle ''established as long ago'' as *Powell* v. *Alabama* (1932) 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]. Thereupon the court concluded: ''We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents *had deliberately elicited* from him after he had been indicted and in the absence of his counsel.'' (Italics added.) (377 U.S. at p. 206.)

Finally, the court did not question the continuance of an investigation of the defendant and his confederates, even though the defendant was under indictment, stating: ''All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here dis-

---

[13]Concerning its earlier opinion in *Spano*, the court went on to say: ''It was pointed out that under our system of justice the most elemental concepts of due process of law contemplate that an indictment be followed by a trial, 'in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law.' 360 U.S., at 327 (Stewart, J., concurring). It was said that a Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less, it was said, might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' 360 U.S., at 326 (Douglas, J., concurring).'' (377 U.S. at p. 204.)

[14]See *Massiah* v. *United States, supra*, 377 U.S. 201, fn. 5.

[15]The court in *Massiah* quoted from *People* v. *Waterman, supra*, 9 N.Y. 2d 561, 565 [216 N.Y.S.2d 70, 175 N.E.2d 445, 448] as follows: '' 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' '' (377 U.S. at p. 205.) It also pointed out that ''since the *Spano* decision the same basic constitutional principle has been broadly reaffirmed by this Court. *Hamilton* v. *Alabama*, 368 U.S. 52 [82 S. Ct. 157, 7 L.Ed.2d 114]; *White* v. *Maryland*, 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193]. See *Gideon* v. *Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733]. (377 U.S. at p. 205.)

closed, could not constitutionally be used by the prosecution as evidence against *him* at his trial."[16] (377 U.S. at p. 207.)

Although to our knowledge no reported California case has dealt with the application of *Massiah* to a factual setting like the present one, various appraisals have been made of the essence of its holding. It has been said that coercive pressures being absent, *Massiah* stands for the extension of the adversary principle: "if it is improper for the government to compel the accused to help convict himself, it may also be considered unfair for the accused to be tricked into convicting himself" (Kurland, *The Supreme Court, 1963 Term* (1964) 78 Harv. L. Rev. 143, 221); that just as the state cannot call the defendant to establish its case by his testimony, it cannot use his inculpatory statements elicited after indictment at a private interrogation in the absence of counsel (26 Univ. of Pittsburgh L. Rev. 151, 152); that *Massiah* "represents a substantial expansion of the right to counsel . . . [which] apparently now guarantees the actual presence of an attorney at all post-indictment interrogations" (39 Tulane L. Rev. 581, 584); and that it is the element of secrecy which *Massiah* condemns and "Thus, the underlying reason for the Court's decision, although not articulated specifically, is probably this element of what might be called 'constructive coercion' in depriving the defendant of counsel." (19 Southwestern L.J. 384, 387.) In *People* v. *Price, supra,* 63 Cal.2d 370, 378 it was said: "In *Massiah* the reversal by the United States Supreme Court was required because there was introduced at defendant's trial evidence of his own incriminating words, 'which federal agents had deliberately elicited from him . . .' in the absence of admonitions or counsel. [Citation.]"

As we read *Massiah,* it articulates and applies this central principle: that incriminating statements made by a defendant after he has been formally charged by indictment or information and while he is in custody are inadmissible where they have been *deliberately elicited* from him by enforcement agents or the police in the absence of his counsel. On its own particular facts, *Massiah* concluded that the surreptitious obtaining of such statements where the defendant was under indictment but *not* in custody (i.e., being free on bail) was

---

[16]We reject the Attorney General's argument predicated on this final sentence that the holding of *Massiah* is restricted to surreptitious investigatory methods. In our view, a reading of this sentence with proper consideration of the court's own emphasis (i.e., the pronoun "him") in the context of the entire final paragraph of the opinion, warrants no such restricted construction of the court's holding.

tantamount to a deliberate eliciting of them during a secret interrogation at a police station or jail. At the core of the court's decision however, as the language of its holding quoted above makes clear, is the act of deliberately eliciting the statements, this crucial language applicable to a *post*-indictment situation foreshadowing the exclusionary rule announced a month later[17] in *Escobedo,* under which in a *pre*-indictment situation one of the conditions to be met was that "the police carry out a process of interrogations that lends itself *to eliciting incriminating statements.*" (Italics added.) (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490-491.) Therefore we are not persuaded by the Attorney General's argument that *Massiah* is here inapplicable because there was nothing surreptitious about the circumstances under which defendant's third statement were made. This argument ignores the basic philosophy of *Massiah* which, following the constitutional precepts given recognition in *Spano, Waterman* and other cited New York cases (see fn. 14, *ante*), condemns the secret interrogation in the absence of his counsel of a defendant who is under indictment and in custody[18] as being in deprivation of the defendant's right to counsel guaranteed by the Sixth Amendment.

■ At the time he gave the statement now under examination, defendant was in the county jail, charged by an information with burglary and represented by counsel. This is not a case where defendant made "unsolicited, spontaneous" statements to the police or sheriff's officers. (See *People* v. *Dorado, supra,* 62 Cal.2d 338, 354, fn.) On the contrary Sergeant Scott, fully aware of the fact that defendant was under the charge of an information and represented by counsel,

[17]*Massiah* was decided on May 18, 1964; *Escobedo* on June 22, 1964.

[18]In *People* v. *Waterman, supra,* 9 N.Y.2d 561, 564-565 [216 N.Y.S.2d 70, 175 N.E.2d 445, 447], the Court of Appeals said: "In *People* v. *Di Biasi,* 7 N.Y.2d 544 [200 N.Y.S.2d 21, 166 N.E.2d 825], *supra,* this court condemned secret interrogation of a defendant by law enforcement authorities after indictment as violative of the defendant's constitutional rights. The decision marked the adoption of the similar view previously expressed by three Judges of this court in dissent in *People* v. *Spano,* 4 N.Y.2d 256, 264-267 [173 N.Y.S.2d 793, 799, 802, 150 N.E.2d 226, 230-232], reversed on other grounds sub nom. *Spano* v. *People of State of New York,* 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265]. Such questioning, we held, impinged upon the defendant's two-fold rights to the assistance of counsel and to freedom from testimonial compulsion. . . . It was likewise not decisive of the finding of testimonial compulsion inherent in the post-indictment interrogation in Di Biasi that the defendant was charged with a capital crime or that he was represented by counsel. The crucial consideration was, rather, that the interrogation to which he was subjected, since it came after indictment, was an impermissible step in the progress of the criminal cause against the defendant."

brought defendant from the jail to the sheriff's office at which place he took a tape-recorded statement from defendant for the second time. A consideration of all of the relevant circumstances of this interrogation, including the sergeant's narrative account of it, satisfies us that it was the type of secret interrogation of a defendant without the protection of his counsel which the court condemned in *Massiah* and that the sergeant thereby deliberately elicited from defendant the incriminating statement subsequently used against him at the trial. We hold that such conduct was impermissible as being frustrative and violative of defendant's constitutional right to the assistance of counsel and that the July statement deliberately elicited thereby was improperly admitted.[19]

Since the July statement does not constitute a confession and is therefore not prejudicial per se (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356; *People* v. *Cooper* (1965) 234 Cal. App.2d 587, 604 [44 Cal.Rptr. 483]), we must determine whether, upon an examination of the entire record, its introduction in evidence caused defendant prejudice. (*People* v. *Hillery, supra,* 62 Cal.2d 692, 712; *People* v. *Robinson* (1965) 62 Cal.2d 889, 896 [44 Cal.Rptr. 762, 402 P.2d 834].) Indeed the statement contains no admissions in respect to the offense of burglarizing the Louisiana Market with which defendant was charged. Considered by itself, it is an exculpatory explanation of his activities in accompanying Sloan to the store and, if believed by the jury, might have brought about defendant's acquittal.

However, Fields, the proprietor of the market, identified defendant as one of the two intruders and as the person who was wounded by Fields inside the store, who showed Fields his arm with blood on it, and who, after he had been apprehended, engaged in a struggle with Fields during which the store window was broken. There was evidence that entrance had been gained by the front door and that the lock had been broken off, probably with a tire wrench later found inside the store. The wrench and a carton of cigarettes were found in a cardboard box very close to where Fields held defendant at gunpoint. A criminologist testified that the cigarette carton had a human blood stain on it; that the cardboard box contained a human blood stain; that in the blood stain on the cigarette carton were three synthetic and wool fibers, of which

---

[19]In fairness to the learned trial judge we point out that the instant case was tried in August 1963, approximately nine months before the decision of the United States Supreme Court in the *Massiah* case.

the wool fiber, upon comparison, fell within the range of color and diameter of the wool fibers in defendant's sweater; that the sleeve of defendant's sweater contained a blood stain; and that flakes of glass collected from defendant's trousers, when examined microscopically and compared with fragments of the broken window of the store were indistinguishable from the latter.

As already mentioned, defendant took the stand in his own behalf and repeated practically the same story he had given Scott in the July statement. Thus he abandoned the claim made in the first two April statements that he was not in the vicinity of the market but had been shot by occupants of a passing car and asserted instead that he was at the market but had not participated in any burglary, having merely accompanied Sloan there for a lawful purpose and having thereafter been wounded in the scuffle outside the market. It is also to be noted that defendant's witnesses testified consistently with this latter theory of case: Defendant's sister testified that when she met him to take him to the hospital he told her that he had been shot by Fields. Defendant's witness Ronnie Powell testified that he saw defendant and Fields struggling over a gun in front of the market. Thus defendant was confronted with the fact that other witnesses, as well as Fields himself, would place defendant at the scene of the crime.

We are therefore led to the conclusion that defendant suffered no prejudice by the admission of the July statement. ■ "[A]dmissions made in the course of an attempted exculpatory statement are not prejudicially received when the defendant at the trial testifies to substantially the same admissions." (*People* v. *Mathis* (1965) 63 Cal.2d 416, 433 [46 Cal. Rptr. 785, 406 P.2d 65]; *People* v. *Hillery, supra,* 62 Cal.2d 692, 712. ■ It therefore cannot reasonably be concluded that defendant was impelled to testify at the trial by the improper introduction in evidence of his July statement. (*People* v. *Nye, supra,* 63 Cal.2d 166, 175-177.) This is not a case in which, when defendant testified, the only substantial evidence introduced connecting him with the crime was his inadmissible extrajudicial statement. (See *People* v. *Davis* (1965) 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142].) Defendant was here impelled to take the stand because of the substantial evidence presented by the People tending to establish that he was the intruder caught in the act of burglarizing the store.

After an examination of the entire cause, including the evidence, it does not appear to us to be reasonably possible

that the above error might have contributed to the conviction. (*Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 331, 333 [46 Cal.Rptr. 515, 405 P.2d 555].) We cannot say that there has been a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.