[Crim. No. 12778.    Second Dist., Div. Five.    Aug. 26, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD DEE HUDDLESTON, Defendant and Appellant.

Thomas P. Breslin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Anthony M. Summers, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—On January 10, 1965, defendant, displaying what appeared to be a gun, held up Dale's food market in Van Nuys. He received some money, but the record is silent with respect to the amount.

The next day, January 11, defendant again carrying what looked like a gun, approached one check stand at the Country Cousins market and relieved the checker, Ron Jones, of an unspecified amount of money. He then went to another check stand and demanded "stack up all the ones, fives, tens and twenties." The checker, Miss Casanova, said: "I will in just a minute. You will have to get at the end of the line and wait your turn." She thought defendant was kidding. Defendant said that he was not taking a turn and repeated his demand for the money. She looked at Glen Huling, the assistant manager, who nodded to her and she "stacked it up." Even after she realized that defendant was not joking, she was not afraid. She was close enough to the gun to see that it had gray bullets in it. A minimum of $500 was taken from Miss Casanova. Defendant then said: "I would advise you not to move until I have been gone five minutes." He left through a side door. Miss Casanova "sure didn't" follow him or sound an alarm.

Deputy Sheriff Jones took defendant into his custody from the Denver police on January 23 or 24, 1965. Defendant was given a then adequate warning of his constitutional rights.[1] He freely confessed the three robberies, but claimed that he had used a toy gun. He did not, at that time, claim that "he was robbing from the Catholics to give the money to the Protestant Churches, or anything along that line . . ." When arrested defendant had $890 on his person.[2] It had been reported to Jones that defendant had told a Denver police sergeant that he was afraid that Sergeant Moulder of the Los Angeles Police Department, who had come to Denver

---

[1]The trial in the instant case started on April 13, 1966.

[2]The total loss reported for the Country Cousins robbery was $1,600.

with Jones, was going to kill him on the way back to Los Angeles.

Sergeant Moulder testified to a conversation with defendant in Los Angeles on January 25, 1965. In that conversation defendant again confessed the three robberies, stating that he got about $300 from Dale's and $1,600 from the Country Cousins market.

When defendant committed these offenses he was on outpatient status from the Metropolitan State Hospital in Norwalk. He had been acquitted of robbery and battery in Fresno in 1960, it having been found that he was not guilty by reason of insanity. After defendant had been in Vacaville for some time, the Superior Court of Solano County had ordered him transferred to Norwalk, while denying his petition to be released. It had never been found that his sanity had been restored. (Pen. Code, § 1026a.)

After defendant's arrest and the filing of the present information it was found that by reason of his mental condition he was unable to stand trial. He spent over a year at Atascadero before the criminal proceedings were resumed.

The case went to trial, nonjury, on defendant's pleas of not guilty and not guilty by reason of insanity. Doctors Abe and Thompson were appointed pursuant to section 1027 of the Penal Code. Their reports were admitted in evidence. They also testified.

In their reports, as well as in their testimony, both doctors concluded that at the time of the offenses defendant had been insane. We quote pertinent portions from the reports.

Doctor Abe: "Defendant was legally insane at the time of commission of offense. He appears to have been under the influence of delusions, causing him to commit his offenses."

Doctor Thompson: "It is the opinion of the examiner that the defendant suffers with schizophrenia, paranoid type and that he is actively psychotic at the present time. He is quite delusional and has only recently stopped having hallucinations. He is disturbed at times and is very depressed and suicidal. He still has delusional ideas concerning the reasons behind his robbery. It is the opinion of the examiner that he is in need of further psychiatric care and treatment. He should be returned to a State Hospital for such further treatment. He is in fact so actively psychotic and depressed that I believe that he should have electric shock therapy. . . . It is the opinion of the examiner that the defendant was insane at the time of commission of the offense."

In their testimony both doctors amplified their finding of insanity by stating that although defendant knew the nature and quality of his acts, he did not know right from wrong.

In essence both psychiatrists were of the opinion that defendant was suffering from delusions. He felt that he was in contact with God, that he was robbing the markets in behalf of God and on behalf of the Protestant churches to bring them up to the standard of the Catholic church.[3] Another delusion was that the Governor wanted to put him in the gas chamber because he had been a burden on the State of California for a long time. He also felt that God wanted him to take his own life before this happened. "They" wanted to drive him to murder.

When the court asked Doctor Abe whether defendant's demand that Miss Casanova not call the police for five minutes and his flight to Denver—in other words his consciousness of possible legal consequences—were consistent with the delusions, the doctor replied: "No, I don't think it would be consistent with the delusional material. I think in that event he would be sane, even if he had delusions. When he took those measures, I would say he would be legally sane." In Doctor Abe's view a person was legally sane, if he realized that his actions might make him responsible to the authorities "even though the higher value indicated he should ignore that risk . . ."

Doctor Thompson's view of legal sanity was not the same. In his view, even though defendant might have known that he could be arrested and punished for his activities he believed "that it [was] right to do what he did" and therefore did not know the difference between right and wrong.

In addition to the reports of Doctors Abe and Thompson there was before the trial court an order of the Superior Court of the County of Solano dated February 28, 1963. The order referred to the fact that some time before that date defendant had been acquitted of robbery "by reason of his insanity at the time of the alleged commission," had been found to be still insane at the time of the acquittal, had improved but not recovered his sanity at the time of the order and was in need of further treatment. The trial court also considered medical reports in connection with defendant's

---

[3]Doctor Abe admitted that he would be more strongly persuaded of the existence of defendant's delusion, had he actually given the money to the Protestant churches. He also admitted that it could be of significance that two weeks after the robberies, when he confessed to the police, defendant had said nothing about his reason for the crimes.

hearing under section 1368 of the Penal Code which had resulted in his commitment to Atascadero. Unquestionably both psychiatrists who had examined defendant at that time diagnosed a mental abnormality as of the time of their examinations which took place more than a month after the two robberies. Also considered by the trial court were two municipal court records which contain further evidence of defendant's mental problems. All of these records have also been examined by this court. At best, from defendant's point of view, they are cumulative of the information furnished by Doctors Abe and Thompson.

On appeal it is claimed that at the outset of the trial defendant—because of his previous commitment under section 1026 of the Penal Code—was presumed to be insane and that the presumption was not overcome at the trial.

Defendant's view that he did enjoy the benefit of a presumption of insanity is supported by *People* v. *Field*, 108 Cal.App.2d 496 [238 P.2d 1052]. Field, at the time of his offense, was an escapee from the Mendocino State Hospital. The court held that his previous commitment to that hospital —though for reasons unknown—created a presumption of insanity. While we are somewhat puzzled by that holding, since the *Field* opinion demonstrates that the court was well aware of the different types of insanity, the presumption was accepted by the trial court here. The court simply felt that it was overcome by the non-psychiatric evidence in the case.

Of course it is not for doctors to formulate definitions of legal insanity. (*People* v. *Wolff*, 61 Cal.2d 795, 811 [40 Cal.Rptr. 271, 394 P.2d 959].) There was no real factual conflict between Doctor Abe and Doctor Thompson although they differed in their views concerning the legal responsibility of a person who knows that he is violating temporal law, but does so in a sincere belief that God has commanded it. There is no need for us to decide which of the two was legally correct. The plain fact is that the trial court felt that both had been taken in by the defendant.[4]     There is, of course, ample

---

[4] "If you take all of the circumstances—I am not unmindful of the fact that the defendant had the opportunity of quite an extensive opportunity of an education of psychiatry and the law. He spent quite a lot of time in the mental hospital of the psychiatric institution and has had quite a chance to think about a good story to give after he got out. Just as there is no necessary connection between committing a robbery, between carrying out the delusional purpose, and having the delusion, similarly it is not necessarily inconsistent that a man has a delusional system and yet at the same time know[s] that by displaying that delu-

authority for the proposition that the trier of fact may consider " 'the conduct and declarations of the defendant occurring within a reasonable time before or after the commission of the alleged act, . . .' " as proof of his mental condition at the time of the offense. (*People* v. *Wolff*, 61 Cal.2d 795, 805 [40 Cal.Rptr. 271, 394 P.2d 959], quoting *People* v. *David*, 12 Cal.2d 639, 649 [86 P.2d 811].) ▮ Defendant's failure to obey the alleged delusional command, except as far as getting the money was concerned, his order not to call the police, his flight to Denver and his failure to soften the impact of his confessions, are more than adequate to support the court's finding of sanity.

Very recently in *People* v. *Coogler*, 71 Cal.2d 153, 166-167 [77 Cal.Rptr. 790, 454 P.2d 686] our Supreme Court was faced with a claim that the expert psychiatric evidence unerringly pointed to diminished capacity. It said: "We recognize that the prosecution produced no expert witnesses of its own to contradict the defense testimony that defendant suffered from a disassociation reaction stemming either from organic or functional mental illness at the time he committed the acts charged. Although unanimity of expert opinion carries persuasive values (see, e.g., *People* v. *Ford* (1966) 65 Cal.2d 41, 55 [52 Cal.Rptr. 228, 416 P.2d 132]), a jury, under certain circumstances, can properly reject such opinions. As we recently explained in *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 ' "The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion. . . ." ' (Quoting *Carter* v. *United States* (D.C.Cir. 1957) 252 F.2d 608, 617 [102 App.D.C. 227].) . . .

" 'This was not a bizarre crime whose very character pointed to dissolution of the accused's deliberative faculties' (*People* v. *Chapman* (1968) 261 Cal.App.2d 149, 165 [67 Cal.Rptr. 601].) (Compare *People* v. *Bassett, supra,* 69 Cal.2d 122; *People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr.

sional system that he may lighten the burden that he may suffer on a nondelusional basis." When the court denied defendant's motion for a new trial, it expressed itself similarly: "So that I must say that, although the doctors buy the proposition that his delusion was the entire cause of this robbery, and although I don't question that he probably did suffer from such delusion—nor do I question that he is presently mentally ill, and that he has a psychotic process which was probably—which he has had for many years, and very likely will have for a long time in the future—still I don't see—I do not see that the evidence is satisfying at all, that that is what caused him to commit the robbery."

635, 423 P.2d 787] ; *People* v. *Goedecke, supra,* 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777] ; *People* v. *Wolff, supra,* 61 Cal.2d 795.) The prosecution's evidence generates the inference that after committing the robbery defendant shot at his victims to avoid identification. (See *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 52-53 [73 Cal.Rptr. 533, 447 P.2d 925] ; *People* v. *Nye* (1965) 63 Cal.2d 166, 172-173 [45 Cal.Rptr. 328, 403 P.2d 736].) Dr. Suarez did speculate that defendant might have killed the women because of a hatred of mother figures, but such an explanation took no account of the fact that defendant had almost fatally wounded Mr. Montoya; moreover, it 'did not enter [the psychiatrist's] mind' that defendant might have shot at his victims in order to avoid identification.''

Only slight paraphrasing makes the Supreme Court's quoted statement applicable to this case.

Defendant also complains that his confessions should not have been admitted since he was not specifically advised that he was entitled to have an attorney present during the interrogation. The lack of any objection below precludes him from raising the point on appeal. (*In re Dennis M.,* 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296] ; cf. *People* v. *Doherty,* 67 Cal.2d 9, 14 [59 Cal.Rptr. 857, 429 P.2d 177].)

In any event the point would have no merit.[5] The first warning was given by Deputy Sheriff Jones in Denver. As he recalled it, he used a Denver Police Department form ''advising [defendant] of the fact that he could remain silent, that anything he said could be used against him, and [that] he was entitled to an attorney.'' Similar warnings have been held adequate. (*People* v. *Hill,* 66 Cal.2d 536, 553 [58 Cal. Rptr. 340, 426 P.2d 908] ; *People* v. *Thomas,* 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233] ; *People* v. *La Vergne,* 64 Cal.2d 265, 270 [49 Cal.Rptr. 557, 411 P.2d 309] ; *People* v. *Luker,* 63 Cal.2d 464, 473 [47 Cal.Rptr. 209, 407 P.2d 9].)

According to Officer Moulder, before he received defendant's confession, he ''told the defendant that he had a right to remain silent, he had the right to an attorney at all stages of the proceedings, that anything he said could be used against him in subsequent court proceedings.''

---

[5]The reason why we discuss it in spite of the lack of an objection is that it is also argued that the failure to object deprived defendant of constitutionally adequate representation in the trial court. (*People* v. *Ibarra,* 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487].)

Defendant appears to contend that the words "at all stages of the proceedings" are misleading in that they appear to relate to court proceedings. We need not consider whether, standing alone, the words would have that effect. In the case at bar the words are clearly juxtaposed to "subsequent court proceedings." We do not believe that defendant was misled.

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.