[No. A024602. First Dist., Div. Two. Dec. 17, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
FLORES ALEXANDER FORBES, Defendant and Appellant.

**COUNSEL**

Thomas W. Perley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—A jury found Flores Alexander Forbes guilty of the second degree murder of Louis Talbert Johnson. (Pen. Code, §§ 187, 189.) Johnson was killed by M-16 rifle fire in the predawn hours of October 23, 1977, during an incident in which he, Forbes and a third individual made an armed

assault on a Richmond residence in an evident attempt to dissuade a witness from testifying the next day in a murder prosecution against Black Panther Party member Huey Newton. In finding Forbes guilty of second degree murder, the jury relied on the doctrine of transferred intent, specially finding that one person was intended to be killed but that, by mistake or inadvertence, Johnson was killed instead. They also found that Forbes was armed with and personally used a firearm (shotgun or rifle) in the commission of the offense (*id.*, §§ 12022, subd. (a), 12022.5) and, probably based on the statute of limitations, found him not guilty of all other counts and lesser included offenses, which arose out of the same incident.[1]

Sentenced on September 7, 1983, to the middle term of six years for the murder (former Pen. Code, § 190) plus a consecutive two years for firearm use (Pen. Code, § 12022.5), Forbes appeals, asserting four points of instructional error and contending that the evidence is insufficient to support a finding of intent to kill.

### BACKGROUND

The People built much of their case on circumstantial evidence, the only eyewitness to the incident being Mary Matthews, the occupant of the assaulted residence. Forbes did not take the stand. In fact, the defense rested immediately after the close of the People's case, without calling any witnesses. Facts relevant to the issues raised on this appeal may be summarized as follows.

The incident took place at Mary Matthews' home at 555 South 31st Street in Richmond. Located behind her house, and on the same property, was a duplex containing apartments with street address numbers 557 and 559. All three address numbers were indicated by signs at the front of the property, on the carport of Matthews' house, and Matthews had on occasion had people come to her house by mistake, looking for the apartment addresses. In the upstairs apartment lived Barbara Gary, and Gary's stepsister lived in the downstairs apartment. Raphaelle Gary, Barbara's sister, would occasionally visit the apartments and stay overnight. Raphaelle had been introduced to Matthews as Crystal Gray.

Forbes and the victim, Louis Johnson, were affiliated with the Black Panther Party. Forbes, in addition, was an associate of Huey Newton. Newton was facing prosecution for murder at the time of the incident, and

---

[1]The existence of the statute of limitations bar (not applicable to the murder count) was left to the jury since there was a question of fact whether Forbes was absent from the state a sufficient period of time (98 days) to toll the three-year statute of limitations and bring the January 29, 1981, grand jury indictment of him within the prescribed period.

Forbes had recently accompanied Newton to several of Newton's court appearances. Earlier, in July, when Newton had flown in to San Francisco from Cuba to surrender himself on outstanding warrants, Forbes met him at the airport, walked with him to awaiting cars and drove away with him. Three years before then, in July 1974, Oakland police had forced their way into an office in a nightclub called the Fox Lounge to arrest Newton. Forbes, one of six or seven people found and arrested in the room with Newton, pulled a .357 magnum revolver on the officers and had to be physically subdued.

The preliminary hearing in Newton's case was scheduled to begin on October 24, 1977. The prosecutor intended to call Crystal Gray (Raphaelle Gary) to testify, consistently with a statement she had made to police in 1974, that she personally witnessed the killing by Newton.[2] About two weeks before the scheduled hearing, the prosecution was compelled by the court to disclose Gray's address to the defense under a protective order limiting disclosure to five members of the defense team. The address given was 557 South 31st Street, Richmond. The defense team had a copy of the police report.

Mary Matthews got out of bed before dawn on October 23 and went to the living room to get something to read. While in the living room, she heard noises at the front door which sounded like someone pulling on the screen door. She called out and asked who was there, but there was no answer. As she headed back toward her bedroom with some reading material, she heard more sounds, this time from the back door. She called out several times but again got no answer. Frightened, she ran into the bedroom, removed a loaded .38 caliber revolver that she kept in the nightstand, and telephoned police. Then she heard a gun shot and a sound like the door breaking open. She dropped the phone, ran out into the hall and fired into the door, possibly two or three times. She heard more shots, ran back into the bedroom, put out the lights, closed the door and hid behind a chair with the gun.

Police officers responding to the call found Matthews still in the house and Louis Johnson lying dead on the lawn in front of the house. Johnson had on a dark colored ski mask, blue jumpsuit, two pair of socks (dark blue over striped), and black leather gloves. Under the jumpsuit, he had on ordinary clothing. Under his body was an M-16 ammunition clip containing 21 live rounds of .223 caliber ammunition. Mary Matthews was unable to

---

[2] It was explained to the jury, through expert testimony, that a police report would be inadmissible in court unless the witness were actually there to testify and that a witness' preliminary hearing testimony, on the other hand, would be admissible should the witness thereafter become legally unavailable.

identify Johnson. An officer took her revolver, which had two expended shells in it.

At the side of the house, officers found a 12-gauge shotgun containing four live rounds and one expended shell. Other such shells and a live round were found on the ground, as were four expended M-16 casings. There was a pool of blood outside the back door and a blood smear leading down the walkway to Johnson's feet, indicating that he had been dragged. The upper part of Johnson's body was covered with blood from a gunshot wound to his upper chest and neck. Officers following a trail of blood that led from the body and down the street sidewalk toward an alleyway found a succession of items—a black knit ski mask, another such ski mask, a pair of blue overalls, an M-16 rifle thrown in some undergrowth against a fence, a second 12-gauge shotgun, another pair of overalls, a brown leather jacket tangled with those overalls, and a left-hand black leather glove. In the alley they found the glove's apparent mate, a right-hand glove with a hole in the back of the palm, and a second pair of black leather gloves.

The hole in the right-hand glove was caused by "gunshot discharge at close range"; there was gun powder residue on the palm and blood on the inside of the glove. Blood found on the glove, the M-16 rifle, the overalls and the jacket matched Forbes' blood type but not the victim's. Blood from the pair of gloves found in the alleyway and from the second shotgun matched neither Forbes' nor the victim's blood.

Forbes suffered a gunshot wound through his right hand. On the day after the killing, he went to the emergency room of Providence Hospital in Oakland, seeking treatment for what he represented was a wound caused by a pop rivet gun. When the examining physician said that the wound looked like a gunshot wound and that the police would have to be notified, Forbes became agitated and promptly left without treatment. Two days later, on October 26, Forbes checked into South Nevada Memorial Hospital in Las Vegas, using the name James Johnson, for surgery and other treatment on the wounded hand.

The back door of Mary Matthews' house led to the kitchen. The screen had been ripped off of the outer aluminum door, and the knob and lock of the inner wooden door had been shot away. The inner door also had a large hole in its center, evidently made by a shotgun blast. The door had been kicked in and was partially open. Extensive damage inside the kitchen, to a washer, stove, cupboard, oven and counter, was caused by two shotgun blasts of double aught buckshot. Additionally, an M-16 round had been fired into the refrigerator, as was evident from a relatively small entry hole and the presence of copper fragments that would have come from the copper-

jacketed .223 caliber ammunition found in the M-16. (The shotgun rounds produced only lead pellets and no copper fragments.) The shotgun and M-16 rounds appeared to have been fired from the doorway. A lead slug found embedded in a kitchen ceiling beam was determined, by its size, recent origin, angle of entry and the absence of copper fragments, to have come from Mary Matthews' .38 caliber revolver.

Medical examination of the victim revealed the cause of death as massive injury and resulting hemmorhage from a small caliber bullet which entered the lower part of the front of the neck and struck the vertebral column at the neck and upper chest. Lack of "tattooing" indicated that the gun was not fired directly up against the victim. Medical and ballistics testimony together established that copper and lead fragments found in the wound were fired from the M-16 rifle and that the wound and presence of copper fragments were not consistent with a wound caused by a .38 caliber weapon.

At trial, the jury was instructed on essentially two theories of culpability for murder, compounded by aiding and abetting instruction on both theories. The first was first degree felony murder based on a premeditated or deliberated killing having occurred during the commission of burglary, with the underlying felony for burglary being the attempt to dissuade or prevent a witness, by means of force or threats of unlawful injury, from appearing in court. (Former Pen. Code, § 136, subd. (b); see Stats. 1976, ch. 1139, § 119, pp. 5092-5093.) The trial court greatly restricted the availability of that option, however, by instructing in accordance with an unpublished decision by Division Three of this court in pretrial writ proceedings. The decision indicated, in dictum, that operation of the merger doctrine (see discussion in *People* v. *Smith* (1984) 35 Cal.3d 798, 803-808 [201 Cal.Rptr. 311, 678 P.2d 886]) might prevent a verdict based on felony murder if there was an assaultive intent behind the burglary. (*Forbes* v. *Superior Court* (Jan. 26, 1983) 1 Civ. 54213, A013368.) The jury was accordingly instructed that a verdict of first degree murder was impossible unless it unanimously agreed that "the specific intent of the burglary did not include an intent to assault the person of another."

The second theory was first or second degree murder based on transferred intent. This theory required the jury to return a special verdict indicating unanimous agreement that one person was intended to be killed but, by mistake or inadvertence, another person was killed. The court instructed, and later reinstructed, that malice would be implied "when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life" and that burglary was such a felony. (See Pen. Code, § 189.)

The jury first did the impossible, returning a verdict of second degree murder predicated on the crime's commission during burglary. Reinstructed that second degree murder was possible only upon a finding of transferred intent, the jury retired and deliberated for just over an hour further before returning a second degree murder verdict, this time with the required special finding.[3] The jury also found that Forbes was armed with a firearm and used a shotgun or rifle in the commission of the crime.

### I*

. . . . . . . . . . . . . . . . . . . . . .

### II

Forbes contends that the court's aiding and abetting instructions inadequately communicated the requirement of specific intent to further the perpetrator's criminal purpose and therefore constituted error under *People v. Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], requiring reversal. We disagree. The instruction condemned in *Beeman* was a standard, unmodified version of CALJIC No. 3.01, which made no reference whatever to the aider and abettor's intent to further the criminal purpose of the perpetrator but allowed conviction on a mere showing of knowledge of the perpetrator's unlawful intent coupled with an act or advice which aided or otherwise furthered commission of the crime. (*Id.,* at p. 555.)

The instruction in this case, by contrast, had inserted into the CALJIC language the word "intentionally" so that it read, in pertinent part, that one aids and abets "if, with knowledge of the unlawful purpose of the perpetrator . . ., he *intentionally* aids, promotes, encourages or instigates[,] by act

---

[3]The following exchange took place.
    "THE COURT: . . . Now, if it was going to be murder of the second degree, it would have to be transferred intent. [¶] Did you understand that?
    "FOREMAN HEARNE: That is what we couldn't agree on.
    "THE COURT: Do you wish to return to the jury room and deliberate this some more? [¶] Do you wish it to be murder of the second degree?
    "FOREMAN HEARNE: Yes.
    "THE COURT: If you do that, then you will have to make a finding—let me explain the law to you so you know. [¶] If it was committed in the course of a burglary, it is first degree. [¶] If it was transferred intent, it can be second degree, do you understand that?
    "FOREMAN HEARNE: Yes.
    "THE COURT: Would all of the jury like to return to the jury room?
    "THE JURY: (Affirmative response.)
    "THE COURT: All right. Thank you."
    *See footnote, *ante,* page 807.

or advice[,] the commission of [the] crime."[5] (Italics added.) That modification, made after the suggestion of the Court of Appeal in *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], was specifically designed to cure the deficiency in the CALJIC instruction. In fact, the same modification (hereafter *Yarber* instruction) had been requested by, but denied to, the defendant in *Beeman*. (*Beeman, supra,* 35 Cal.3d 547, 554.)

In holding the unmodified CALJIC No. 3.01 to be inadequate, the *Beeman* court proposed a model instruction of its own making.[6] It had no occasion to determine whether the *Yarber* instruction would have been adequate, that instruction having been refused by the trial court. In choosing to formulate its own instruction, however, the court commented that the *Yarber* instruction and a pre-1974 version of CALJIC No. 3.01 were both "sufficiently ambiguous to conceivably permit conviction upon a finding of an intentional act which aids, without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense." (*Beeman, supra,* 35 Cal.3d 547, 561.) The court did not elaborate on the perceived ambiguity or attempt in any way to distinguish between the *Yarber* instruction and the former CALJIC instruction, which, instead of containing the word "intentionally," used the vague phrase "knowingly and with criminal intent." (*Id.,* at p. 555.)

We do not view the *Beeman* court's comment as indicating that the giving of a *Yarber* instruction constitutes error. The instruction is a vast improvement over the unmodified CALJIC No. 3.01 and, we believe, adequately conveys the requisite intent. Stripped to its essentials, the *Yarber* instruction

---

[5]The court's reading of CALJIC No. 3.00 (1981 rev.) was, in pertinent part, as follows:
"The persons concerned in the commission of a crime or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:
". . . . . . . . . . . . . . . . . . . . .
"2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits or attempts to commit the crime, aid and abet in its commission or attempted commission,
"3. Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission.
"One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged."
The court's reading of CALJIC No. 3.01, as modified, was in part as follows (italics added): "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime."

[6]"We suggest that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Beeman, supra,* 35 Cal.3d 547, 561.)

requires that the person, by his or her act or advice with knowledge of the unlawful purpose of the perpetrator, "*intentionally aids, promotes, encourages or instigates*" the crime. With all due respect, we fail to see how the instruction even "conceivably" permits a finding of an intentional act without a finding of intent to encourage or facilitate. The adverb "intentionally" immediately precedes the verbs "aids, promotes, encourages or instigates"; it does not modify the nouns "act or advice" and, indeed, could not do so grammatically.

What concerned the court in *Beeman* was that an improperly instructed jury could find it sufficient that the defendant *intentionally acted* and thereby facilitated or encouraged the crime, but without meaning to. Thus, conviction could result from an intentional act which, by *negligence* or *accident*, aided the commission of the crime. (*Beeman, supra,* 35 Cal.3d 547, 560.) However, the *Yarber* instruction's inclusion of the word "intentionally" precludes that result. One cannot, in common understanding, intentionally aid, intentionally promote, intentionally encourage *or* intentionally instigate the commission of a crime by mere negligence or accident.

We hold that the instruction is adequate. For these reasons, we disagree with the uncritical assumption by the Court of Appeal in *People* v. *Henderson* (1985) 163 Cal.App.3d 1001, at page 1008 [209 Cal.Rptr. 883], that the *Beeman* dictum compels a finding of error in the giving of the *Yarber* instruction.

We also find unpersuasive Forbes' argument that the court's failure to modify CALJIC No. 3.00, as it did CALJIC No. 3.01, undermines the efficacy of the instructions as a whole. The function of CALJIC No. 3.00 is to define who is to be considered a principal in the commission of a crime. It instructs, in part, that those who "aid and abet" the crime are principals and are liable, not only for the acts they thought they were aiding and abetting, but also for the natural and probable consequences of those acts (see *Beeman, supra,* 35 Cal.3d 547, 560). While the version of CALJIC No. 3.00 given in this case employed the words (or variants of the words) "aid and abet" three times, it did not purport to define them. (See fn. 5, *ante.*) That is the specific function of CALJIC No. 3.01. At Forbes' trial, the two instructions were given together, and the jury was told to consider the court's instructions as a whole and to regard each in light of all the others (CALJIC No. 1.01 (1979 rev.)). It might have been preferable to modify CALJIC No. 3.00, out of caution (see, e.g., CALJIC No. 3.00 (1984 rev.)), but failure to do that did not, in our view, render the instructions defective as a whole in this case.[7]

---

[7]One troubling aspect of the 1979 version of CALJIC No. 3.00 given in this case is its

### III*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### IV

■ In a supplemental brief, Forbes urges that it was error for the court not to instruct on its own motion that the jurors must unanimously agree on which of two theories—direct perpetration or aiding and abetting—they relied in finding him guilty of murder. Forbes' sole authority on point no longer exists, the Supreme Court having directed that the decision not be published in the official reports. (Rule 977(a), Cal. Rules of Court.) Existing case authority, though not directly on point, is by clear implication against Forbes' argument.

Where the evidence shows more than one act which could constitute the charged offense and the prosecution does not elect to rely on any one such act, a unanimity instruction is usually required. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-282 [182 Cal.Rptr. 354, 643 P.2d 971]; see, e.g., CALJIC No. 17.01.) However, such instruction has uniformly been held unnecessary where a single charged offense is submitted to the jury on alternative legal theories of culpability, a common example being where a charge of first degree murder is supported on alternate theories of felony murder or willful, deliberate and premeditated killing. (Pen. Code, § 189.) It is held sufficient that each juror is convinced beyond a reasonable doubt that the defendant committed the offense *as that offense is defined by statute.* (*People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956], reaffirming *People* v. *Nye* (1965) 63 Cal.2d 166, 173 [45 Cal.Rptr. 328, 403 P.2d 736] (cert. den. (1966) 384 U.S. 1026 [16 L.Ed.2d 1033,

---

numbered paragraph "3," which defines as principals "[t]hose who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission." The paragraph obviously defines one variety of aiding and abetting yet does not use the term "aid and abet." Thus, a juror could conceivably fail to tie the aiding and abetting definition of CALJIC No. 3.01 to that category of principal. We note that the 1984 revision of CALJIC No. 3.00 wisely eliminates paragraph "3" in favor of an all inclusive paragraph which simply defines as a principal, "Those who aid and abet the [commission] [or] [attempted commission] of the crime."

We do not believe that the jury in this case could have been misled by paragraph "3." Its focus is on those who advise or encourage the commission of a crime but are not present. The only evidence in this case was that Forbes *was* present. To the unlikely extent that any juror dwelt on Forbes' active participation as advice or encouragement, we believe that the words "advise" and "encourage" carry a sufficient connotation of intent to have insured, on the facts of this case, against a finding of guilt based on *accidental* or *negligent* furtherance of the crime, which was the root concern of the *Beeman* court. (*Beeman, supra,* 35 Cal.3d 547, 560.)

*See footnote, *ante,* page 807.

86 S.Ct. 1960]); *People* v. *Guerra* (1985) 40 Cal.3d 377, 386 [220 Cal.Rptr. 374, 708 P.2d 1252]; *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 272-273 [169 Cal.Rptr. 497].) An aider and abettor is defined by California statute as a principal in the offense equally guilty with the perpetrator. (Pen. Code, §§ 30-31; *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].) It follows that jurors need not unanimously agree by which statute the defendant attains his status as a principal in the crime. There was no error.

V*

. . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Kline, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied January 16, 1986, and appellant's petition for review by the Supreme Court was denied March 13, 1986.

---

*See footnote, *ante,* page 807.