Filed 6/19/14  P. v. Guzman CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245452 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA378549) |
| v. | |
| CARLOS GUZMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed in part, reversed in part and remanded with directions.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

Carlos Guzman (appellant) appeals from the judgment entered following a jury trial in which he was convicted of first degree murder (Pen. Code, § 187, subd. (a)), with a jury finding the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)).[1] Appellant admitted he had a prior conviction of assault with a deadly weapon, which is a serious felony and a strike within the meaning of the three strikes law.  (§§ 667, 1170.12, 1192.7, subd. (c)(23).)

The trial court sentenced appellant to state prison for a doubled term of 25 years to life, or 50 years to life.

## CONTENTIONS

In this appeal, appellant asserts his admissions to aiding and abetting murder were inadmissible in evidence because he was not given a reasonably contemporaneous *Miranda* advisement prior to a renewed police interrogation.  (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L. Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).)  He makes two contentions of instructional error, complaining the trial court had a duty to charge on unanimity and was required to give more complete instructions on the aiding and abetting/natural and probable consequences theory of liability.  He contends there was prosecutorial misconduct as the prosecutor argued during his closing comments aiders and abettors are "equally responsible" with the direct perpetrator for the commission of an offense. He contends the errors found in this record cumulatively require a reversal.

We agree with appellant that the instructions concerning the aiding and abetting/natural and probable consequences doctrine were erroneous.  As this court cannot determine beyond a reasonable doubt whether some jurors relied on the erroneous jury instructions in returning a verdict, we will order the judgment reversed in part and modified to provide for a conviction of second degree murder unless respondent wishes to retry appellant for first degree murder.

---

[1]     All further references are to the Penal Code unless otherwise indicated.

2

# BACKGROUND

We view the evidence in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

1. *The People's case-in-chief*

a. *The homicide.*

At about 5:00 p.m. on November 13, 2010, Dolores Jose Rodriquez (Rodriguez) bicycled from his residence to a bar located at Florence and Holmes Avenues in the Firestone area of Los Angeles County. He wanted to see the Pacquiao boxing match at the bar. He left his residence with a cell phone and his watch and wallet.

At about 8:39 p.m. that night, Los Angeles County Deputy Sheriffs Chris Mezzano (Deputy Mezzano) and David Rodriquez (Deputy Rodriguez), local gang officers, stopped appellant and Jhony Dominguez (Dominquez), who were on parole. Appellant and Dominguez were standing in an alley next to appellant's 1999 Mazda MVP minivan, California license plate No. 5BOX597. The alley ran behind appellant's Firestone area residence, 71114 ½ East 76th Street, in the County of Los Angeles. Deputy Mezzano searched the minivan and observed a metal baseball bat laying in its hatchback area. Appellant was dressed in plaid shorts and a baggy gray T-shirt.

Several hours later, in the early morning hours of the next day, at 12:05 a.m. on November 14, 2010, a woman named "Sandra" telephoned 9-1-1. She reported two "guys" were "hitting [a Hispanic man] . . . with a bat in the head" in front of the Laundromat located at Bell Avenue and Nadeau Street. Sandra said the victim was bleeding, and the assailants had driven off northbound in a white-ish van.[2]

Deputies responded to 1902 East Nadeau Street and found Rodriguez lying on the ground bleeding. Rodriguez was transported to the hospital and passed away the following day. At the time of his admission to the hospital, Rodriguez's blood alcohol level was 0.3 percent. The deputy medical examiner opined the cause of death was the infliction of blunt force head trauma. Rodriguez had suffered at least two blows to the

---

[2] Sandra could not be located at the time of trial.

head and face from a blunt object; the injuries were consistent with the use of a baseball bat. The blows shattered Rodriguez's skull and caused hemorrhaging at several locations in the brain.

Deputy Mezzano was one of the deputies who responded to the 9-1-1 call. He was told the assailants were two Hispanic males wearing dark pants and white T-shirts. Appellant's residence and the assault site were approximately a mile and a half from one another inside the Florencia 13 street gang's territory. Appellant and Dominquez had extensive gang tattoos indicating they were part of the 64th Street clique of the Florencia 13 criminal street gang. Deputy Mezzano and his partner attempted to locate appellant due to the similarities in the suspect and the minivan descriptions and the use of a baseball bat. The deputies were unsuccessful.

It was later discovered, shortly before 2:00 a.m. on November 14, 2010, Deputy Sheriff Victor Lemus (Deputy Lemus) responded to a call from the nearby Vaquero Bar at Gage and Holmes Avenues. The bar's owner told Deputy Lemus appellant and Jonathan L. were "disturbing customers" attempting to enter the bar. Deputy Lemus was aware the Vaquero Bar is a Florencia 13 gang hangout. There was a crowd outside the door of the bar. The deputy "associated" appellant with a minivan parked at the location. At 1:48 a.m., the license plate recognition software in the computer in Deputy Lemus's patrol car automatically photographed the minivan's license plate. Deputy Lemus searched the minivan but discovered nothing unusual and did not recall seeing any blood.

b. *The investigation.*

On November 15, 2010, appellant was arrested. His minivan was impounded. Rodriquez's cell phone, as well as some apparent blood, was discovered on and inside the minivan. There was a skateboard inside the minivan, but the baseball bat previously observed by Deputy Mezzano was missing. The deputies never recovered the baseball bat.

4

Deputy Michael Valento (Deputy Valento), the homicide investigator, inventoried the items in Rodriquez's personal property after his death. The deputy found no valuables in Rodriguez's property, with the exception of a five-dollar bill and a one-dollar bill discovered inside Rodriguez's pants pockets.

Deputy Valento spoke to appellant's wife, Olivia Cedillo (Cedillo). Cedillo provided appellant with a partial alibi. She acknowledged appellant always kept an aluminum baseball bat in the hatchback area of the minivan and he was the driver of that minivan.

Initially, appellant was the only known suspect in the murder. Deputy Valento eliminated Dominguez as a suspect as Dominguez had been wearing an Global Positioning System (G.P.S.) ankle bracelet. Parole records disclosed Dominguez was in the Firestone area until about 11:00 p.m. However, Dominguez was at home in Southgate at the time of the murder.

Jonathan L., age 17, had been seen by Deputy Lemus with appellant at the Vaquero Bar shortly after the assault. Initially, Jonathan L. could not be linked to the fatal beating. However, in August 2011, the crime laboratory notified Deputy Valento that Jonathan L.'s DNA had been found in the blood recovered inside the minivan. Another potential suspect was Luis Q., age 15, whose gang moniker was "Exert." The deputies were unable to develop any evidence linking Luis Q. to the assault.

c. *Appellant's statement to the deputies.*

At 6:40 p.m. on November 15, 2010, Deputy Valento and his partner spoke to appellant in custody after appellant had waived his *Miranda* rights. (*Miranda, supra*, 384 U.S. 436.)

Initially, appellant told Deputy Valento he had picked up Dominguez in Southgate so they could watch the Pacquiao fight. After the deputies stopped him and Dominguez at 8:30 p.m., appellant's wife became upset as appellant was associating with another parolee. Appellant claimed at that point, he drove Dominguez home. Appellant told Deputy Valento thereafter he ran errands for his family or was at home with his wife. Appellant denied he was aware there was a baseball bat inside the minivan.

5

Blood and Rodriguez's cell phone had been found in appellant's minivan. Deputy Valento confronted appellant with this incriminating evidence, as well as the 1:48 a.m. photograph of appellant's minivan parked at the Vaquero Bar.

Appellant changed his story. He told the deputy he had been with "Suspect" and "Exert" that night. After he was stopped in the alley with Dominguez, he, Dominguez and a "couple of homies" were at a party watching the Pacquiao fight. Appellant was drinking. After the fight, appellant drove Dominguez home. Returning from Southgate, appellant had two other gang members in the minivan with him. They saw "this dude . . . right there standing on the corner of . . . Bell and Nadeau." Appellant whistled at a girl as he passed by. In an apparent response, a man on the corner raised his arm over his head. Appellant, needing glasses, did not know whether the man had made a disrespectful gesture to appellant. Appellant claimed he pulled over his minivan in order to talk to some girls.

When appellant stopped his minivan, the man was crossing the street. Appellant's passengers asked the man, " 'Hey, dog, where you from?' " Appellant told his passengers, " 'Hurry up, fool. Hurry up. Just bang him or whatever.' " Appellant believed the man was probably drunk. The man attempted to take a swing at the youths, but they hit him and then beat him, and "that was it." Appellant claimed the man replied to their initial where-are-you-from inquiry, but appellant could not hear the reply as the man had mumbled. Appellant denied getting out of the van to assist or to back up his two companions. Appellant explained that his passengers, the assailants, were two "youngsters" he knew "from the neighborhood."

When asked whether the youngsters had grabbed the bat from the hatchback of the van to commit the assault, appellant replied all he recalled was that one of the youths said he was going to grab the skateboard. Appellant kept telling the youngsters, " 'Hurry up, fool. Hurry up.' " He heard, " '[P]ow, pow, pow' " as if an object was striking a concrete floor. He looked at the source of the noise, and the youngsters were using the baseball bat to hit the man. He observed the skateboard was still in his minivan.

6

When asked how many times the victim had been hit and if he was on the ground when he was struck, appellant did not reply. Then appellant said, "Yeah, because I remember a car pulling up from the back, and I'm looking like, 'What the f---? Hurry up, dog.' " He heard the bat hitting cement. He turned and looked, and the man was on the ground. All appellant could see was one youngster checking the man's pockets while the other youngster hit the man with the bat.

d. *The recorded jailhouse conversation between appellant and Dominguez.*

On November 29, 2010, Deputy Valento put appellant in a cell with Dominquez and recorded their conversation. Appellant inquired about what Dominguez had told the police. Dominguez replied he told the deputies appellant drove him home and he knew nothing. Appellant informed Dominguez that after they had dropped Dominquez off, he and the youngsters were pulled over at the Vaquero Bar. He exclaimed, "[T]he " 'jura' [the deputies] f---ed up as they didn't card us, fool." He said the deputies failed to take his name and simply recorded his minivan's license number. Appellant told Dominguez he had informed the police Dominguez was wearing the G.P.S. sensor on his ankle.

e. *The forensic evidence.*

A forensic examination of appellant's minivan disclosed Jonathan L.'s fingerprints on a beer can found in the minivan's hatchback. DNA from Jonathan L. was found on the back of the front passenger seat, as well as on the right rear exterior of the minivan. Appellant's fingerprints were found on a Mountain Dew can located on the rear seat floorboard under the front passenger seat; his DNA was on an interior passenger door handle of the minivan and on a water bottle found inside the minivan. The criminalists found Rodriquez's DNA in the blood on the right rear bumper of the minivan and in the blood collected atop the seat bottom of the right front passenger seat.

f. *The testimony concerning motive.*

Deputy Rodriguez testified as an expert on criminal street gangs and specifically as to Florencia 13, a criminal street gang with which he had personal experience. He testified Florencia 13 is a large, well-establish gang of some 2000 members. He set out its territorial boundaries in the Firestone area. Among the gang's primary activities were

7

the commission of crimes such as assaults with a deadly weapon and attempted murder. He commented one aspect of gang culture is that gang members value "respect" very highly. But by "respect," they are referring to making others afraid of them due to their proclivity to engage in violence.

Gang members control their neighborhoods by committing acts of violence, intimidating residents and instilling fear in the community. They gain stature within the gang by "putting in work" for the gang, i.e., committing crimes that range from car theft to murder. They patrol their neighborhoods and mark their territory with graffiti as part of their effort to maintain control over an area.

The inquiry "Where are you from?" is a direct challenge to others. It is usually a signal a violent confrontation will occur, and the aftermath to the challenge will be an assault. If gang members do not react violently to other gang members and strangers in their neighborhood, they will be perceived as weak and they will be victimized by other gangs and rivals for the territory they possess.

The gang Florencia 13 is territorial. If someone is disrespectful to gang members inside their own territory, such conduct calls for retaliation, i.e., an immediate act of violence. Violence is more likely to occur in the event of disrespect that occurs in front of fellow gang members. No gang member wants to look weak. So retaliation is required.

Gang members generally commit crimes with one another. They can trust other gang members who are attempting to prove themselves not to speak to the authorities about their criminal activities or to "snitch[]."

Deputy Rodriguez revealed appellant had admitted to him that he is a Florencia 13 gang member. His moniker is "Trusty." Jonathan L. is reputed within the gang officer community to be a Florencia 13 gang member with the moniker, "L'il Trusty." The deputy explained when gang members of different generations bond, they often take on

8

names such as "Little," "Baby," or "Infant," added to their mentor's name. These nicknames indicate their bond with the mentor.[3]

2. *The defense.*

Appellant declined to testify.

In defense, he called Humberto Guizar (Guizar), a civil rights and personal injury attorney, who had qualified a number of times in court to testify as a gang expert. Guizar claimed as a juvenile, he was a "hardcore gang member" of two downtown Los Angeles gangs. At that time, he graduated to the gang status of a "shotcaller." Guizar opined it was highly unlikely someone as old as appellant, with a child and who had been to prison, was an active gang member. Guizar claimed most gang members are active with a gang between the ages of 14 and 19 years. Also, persons who go to prison drop out of the gang life because the inmates in state prison will not tolerate such activity there.

Guizar was given a hypothetical with facts that were similar to those in the instant case. He gave his opinion that appellant was not acting to benefit the gang. Guizar commented the expression "bang[ing] on somebody" did not necessarily mean hitting the person. It might also be used to indicate "hit[ting] them up." Guizar said that committing a criminal act with an older, inactive gang member present constituted "stupidity" or showed no consideration as to what the older person might think of such misconduct.

## DISCUSSION

1. *The* Miranda *contention.*

Appellant contends his 6:40 p.m., November 15, 2010, statement to Deputy Valento is inadmissible in evidence in the absence of a contemporaneous *Miranda* warning and waiver. (*Miranda, supra*, 384 U.S. 436.)

---

[3]   The deputy continued his testimony testifying as relevant to establish the elements of the criminal street gang enhancement. That testimony is omitted from the statement of facts as it is not relevant to the appeal.

a. *Background*

Before the trial, trial counsel moved to exclude from the trial evidence the statement Deputy Valento and his partner obtained from appellant. The ground for the exclusion was Deputy Valento's failure to repeat the *Miranda* advisements given to appellant earlier that day when the arresting officer initially interviewed him. Trial counsel claimed the failure to readvise appellant and obtain a new *Miranda* waiver rendered the statements made during the subsequent 6:40 p.m. Deputy Valento interview inadmissible in evidence.

At a pretrial evidentiary hearing on the issue, Deputy Rodriguez testified he and his partner, Deputy Mezzano, arrested appellant in the early morning hours of November 15, 2010. They transported appellant in the back seat of their police vehicle to the Century Regional Detention Center. At approximately 1:00 a.m. on November 15, 2010, the deputies spoke to appellant inside the deputies' police vehicle in the detention center's parking lot. Deputy Rodriguez advised appellant of his *Miranda* rights, and appellant waived those rights. The deputies interviewed appellant for approximately 15 minutes concerning the beating. In response to the deputies' questions, appellant insisted he did not know what the deputies were talking about.

Deputy Valento testified that a number of hours later on the same day, at 6:40 p.m., he initiated another interview. Appellant was in custody at the same location, the Century Regional Detention Center. When Deputy Valento commenced the interview, he was aware appellant had waived his *Miranda* rights at 1:45 a.m. that morning. The time of the initial interview and the *Miranda* waiver was documented in a supplemental police report. As appellant had been advised of, and had waived, his *Miranda* rights within the last 24 hours, Deputy Valento simply initiated the interview without an additional advisement and waiver. The deputy did not remind appellant of his rights, nor did he mention the previous *Miranda* advisement and waiver. The deputy interviewed appellant for roughly 40 minutes. This interview resulted in the party admissions the prosecution used at trial.

10

At 9:00 p.m. the same day, November 15, 2010, Deputy Valento again spoke to appellant.  There was a fourth interview at approximately 5:00 p.m. on November 16, 2010.  Deputy Valento interviewed appellant a fifth time on November 22, 2010, and once again on November 29, 2010.  During the final November 29, 2010, interview, Deputy Valento readvised appellant of his *Miranda* rights and obtained a waiver of rights.

After listening to the deputies' testimony, the trial court ruled appellant made a knowing and intelligent waiver of *Miranda* rights before speaking to Deputy Rodriguez.  It also ruled the subsequent interrogation was "reasonably contemporaneous" with the prior valid advisement and waiver, and thus, at 6:40 p.m., no additional advisement and waiver of *Miranda* rights was required.

b.  *The relevant legal principles*

The prosecution bears the burden of demonstrating the validity of a defendant's *Miranda* waiver by a preponderance of the evidence.  The question this court must address is whether the alleged waiver was voluntary, knowing, and intelligent under the totality of the circumstances surrounding  the interrogation.  (*People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*).)  "In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra*, 384 U.S. 436, the scope of our review is well established.  'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.]  However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citations.]"  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033.)  We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*.  (*Id*. at pp. 1032-1033.)

"[R]eadvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver.  [Citations.]  The courts examine the totality of the circumstances, including the amount of time that has passed

11

since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights.' [Citations.]" (*People v. Mickle* (1991) 54 Cal.3d 140, 170; accord, *People v. Pearson* (2012) 53 Cal.4th 306, 316-317; *Williams, supra*, 49 Cal.4th at pp. 434-435.)

        c. *The analysis*

Here, the defense raised no issue as to whether appellant made a valid *Miranda* waiver during his initial statement to the deputies at 1:00 a.m. or 1:45 a.m. on November 15, 2010. The trial court ruled that the subsequent 6:40 p.m. November 15, 2010 interview by another deputy, Deputy Valento, did not require an explicit readvisement of *Miranda* rights and a waiver of rights prior to the interview. Only 15 to 16 hours had elapsed between the initial 1:45 a.m. interview and that which occurred at 6:40 p.m.

Two different sheriff's deputies were involved in the initial and subsequent interviews. However, appellant was at the same detention center and in the custody of the same agency during the interviews. There is a strong inference of criminal sophistication and knowledge of the legal system as appellant had previously undergone legal proceedings that resulted in his imprisonment and he was on parole at the time of the fatal beating. He was 24 years old.[4] During the 6:40 p.m. interview, he exhibited no reluctance to speak to Deputy Valento concerning the beating.

In the circumstances, the trial court properly concluded the passage of time between the two interviews was not so great as to create an inference appellant no longer understood or remembered the rights he had expressly waived earlier. Only some 18 hours had elapsed between the initial and the 6:40 p.m. interview.

---

[4]    According to the data in the probation report, appellant was age 24 on the date of the offense.

(*People v. Duff* (2014) 58 Cal.4th 527, 555 [acknowledging in dicta the California Supreme Court had approved the resumption of interrogation without a readvisement even a day to two after the initial waiver]; see, e.g., *Williams, supra*, 49 Cal.4th at p. 435 [an experienced defendant was interviewed without advisement by same officer 40 hours after initial advisement]; *Mickle, supra*, 54 Cal.3d at p. 171 [an interrogation conducted 36 hours after the first interview was reasonably contemporaneous].)

2. *The failure to charge the jury with a sua sponte instruction on unanimity.*

In *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*Ring*) and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), the court applied the principle that federal due process requires any facts triggering a higher maximum penalty for a crime to be found by the jury beyond a reasonable doubt.

In California, the duty to give a unanimity instruction revolves upon whether the trial evidence indicates the defendant committed more than " 'one discrete criminal event.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.)  In *Schad v. Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491] (*Schad*), the United States Supreme Court upheld Arizona law, which like California law, treats different theories of murder, such as premeditation and felony murder, as alternative theories upon which a person can be convicted of murder, not as separate offenses of murder, and thus requires no jury unanimity.  *Shad* held that the legislative treatment of the alternative means of committing murder as different theories rather than different offenses does not exceed the limits of due process.

In our case, at trial, the prosecution argued appellant was guilty of murder in the first degree, and the jurors could reach such a verdict by applying three different theories of criminal liability:  (1) that appellant got out of the minivan and was one of the two direct perpetrators of the fatal beating with the bat; (2) appellant and his cohorts committed murder in the course of a second degree robbery, conduct which amounts to first degree felony murder; and (3) appellant was an aider and abettor to a target offense of assault by means of force likely to produce great bodily injury or with a deadly

13

weapon, and the natural and probable consequence of the target offense was the non-target, charged offense of murder, the degree of which was first degree murder.

Appellant contends that following *Apprendi* and *Ring*, we must look through the labels attached to the conduct and to insist on unanimity as to the preliminary facts of the murder, i.e., the actus reas of the various theories the prosecution was utilizing to establish criminal liability. In other words, the jury not only had to agree appellant committed first degree murder, it was also required to agree on the specific role the defendant played during the discrete criminal event. Appellant argues a sua sponte unanimity instruction was required as to the specific acts appellant had committed, and the trial court's failure to deliver such a unanimity instruction requires a reversal of the judgment.[5]

The contention lacks merit.

The trial court charged the jury with CALCRIM No. 548, as follows.

"The defendant has been prosecuted for murder under three theories: (1) malice aforethought, (2) felony murder, and (3) natural and probabl[e] consequences. [¶] Each theory of murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory."

The jury was charged as to reasonable doubt (CALCRIM No. 220), and told that if it found a natural and probable consequence of the target offense was murder, it "must then determine whether the murder was of the first or second degree" (CALCRIM No. 520). It was instructed: "Your verdict on each count and any special findings must

_____

[5]    We surmise appellant is suggesting the trial court was required to give a jury instruction such as that set forth in CALCRIM No. 3500: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

14

be unanimous.  This means that, to return a verdict, all of you must agree to it," and "You will be given a verdict form.  As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict form and notify the bailiff. . . ."

The jury was given a verdict form which said the following:  "We, the jury . . . find the defendant, [appellant] guilty of murder in the ___ degree."  The verdict form specified the foreperson was to fill in the blank in the sentence above with the degree of the jury's finding, i.e., the form specified, "write '1st' or '2nd' " in the provided space.  In returning its verdict, the jury foreperson wrote, "1st," in the appropriate blank in above direction and returned the verdict form to the bailiff.

After reviewing the parties' arguments and authorities, we conclude the jury was not required to decide which of the three proposed theories (direct perpetrator vs. first-degree felony murder vs. aiding and abetting/natural and probable consequences doctrine) governed the killing.  Each juror need only have found appellant guilty beyond a reasonable doubt of the single, statutory offense of first or second degree murder. (*Schad, supra,* 501 U.S. at p. 641.)  Whatever the basis for this long-standing rule (see *Schad* at p. 642), it follows that the same jury need not have unanimously agreed on the precise factual details of how a killing under one or the other theory occurred in order to convict a defendant of first or second degree murder.  (*People v. Pride* (1992) 3 Cal.4th 195, 249-250.)

This issue is well settled as the California Supreme Court has repeatedly rejected appellant's contention.  (See, e.g., *People v. Moore* (2011) 51 Cal.4th 386, 413 (*Moore*); *People v. Tate* (2010) 49 Cal.4th 635, 697; *People v. Collins* (2010) 49 Cal.4th 175, 214; *People v. Friend* (2009) 47 Cal.4th 1, 54; *People v. Santamaria* (1994) 8 Cal.4th 903, 918-919; see also, *People v. Forbes* (1985) 175 Cal.App.3d 807, 816-817 [jurors need not unanimously agree by which statute the defendant attains his status as a principal in the crime]; *People v. Perez* (1993) 21 Cal.App.4th 214, 222 ["Both the United States Supreme Court in *Schad* and the California Supreme Court on several occasions have held jurors need not unanimously agree on the theory supporting liability [for murder]."].)

15

Citing the decisions in *People v. Taylor* (2010) 48 Cal.4th 574, 626, and *People v. Morgan* (2007) 42 Cal.4th 593, 617, the court in *Moore*, *supra*, 51 Cal.4th at page 413, also rejected any claim that the decisions in *Apprendi* and *Ring* have changed the unanimity requirements for alternative theories of a substantive offense such as first degree murder.

The recent opinion in *People v. Quiroz* (2013) 215 Cal.App.4th 65 provides a detailed discussion of the reasons for rejecting the contention in the precise factual context presented here.  This court cannot improve on the analysis provided in *Quiroz*.

3.  *The jury instructions on aiding and abetting and the natural and the probable consequences doctrine were erroneous.*

Appellant contends the trial court prejudicially erred by failing to instruct the jury that in order to find him guilty of first degree murder on an aiding and abetting/natural and probable consequences theory, it had to find that first degree murder (as opposed to simply murder) was a natural and probable consequence of the target offense.

a.  *Background.*

The jury was charged with the legal principles concerning aiding and abetting in CALCRIM No. 400, "Aiding and Abetting:  General Principles," and CALCRIM No. 401, "Aiding and Abetting: Intended Crimes."  The trial court charged the jury with CALCRIM No. 403, concerning the natural and probable consequences doctrine, as it concerns a non-target charged offense, as follows.

"Before you decide whether the defendant is guilty of Murder, you must decide whether he is guilty of Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury.

"To prove that the defendant is guilty of Murder, the People must prove that:

"1.  The defendant is guilty of Assault with a Deadly Weapon or Force Likely to Product Great Bodily Injury;

"2.  During the commission of Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury a coparticipant in that Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury committed the crime of Murder;

16

"AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that *the commission of the Murder was a natural and probable consequence of the commission of the Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury.*

"A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"*A natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the Murder was committed for a reason independent of the common plan to commit the Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury, then the commission of Murder was not a natural and probable consequence of Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury.

"*To decide whether crime of Murder was committed, please refer to the separate instructions that I will give you on that crime.*"  (Italics added.)

The trial court instructed that to find "defendant" guilty of murder, the People had to prove "defendant" committed an act that caused the death of another person, that "defendant" acted with malice aforethought, and that he killed without lawful justification.  (CALCRIM No. 520.)

The trial court further instructed that if the jury found "defendant" guilty of murder as an aider and abettor it had to determine whether the murder was of the first or second degree.  It then instructed that to find "defendant" guilty of first degree murder, the People had to prove "defendant" acted willfully, deliberately and with premeditation, and that all other murders were of the second degree.  (CALCRIM No. 521.)

17

b. *The analysis.*

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920; see *People v. Prettyman* (1996) 14 Cal.4th 248, 254 .) "A reasonably foreseeable consequence is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case. (*People v. Medina, supra*, 46 Cal.4th at p. 920.)" (*People v. Favor* (2012) 54 Cal.4th 868, 874.)

The correctness of a jury instruction is determined from the entire charge of the court. (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

(1) *Forfeiture.*

Respondent argues there is a forfeiture as trial counsel failed to object in the trial court to the trial court's use of CALCRIM No. 403. However, this rule does not apply where a trial court, as here, gives an instruction that is an incorrect statement of law. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) We follow the recent decision in *People v. Chiu* (June 2, 2014, S202724) ___ Cal.4th ___ [2014 Lexis 3760] (*Chiu*). Pursuant to that decision, using the instructions CALCRIM No. 403 together with CALCRIM Nos. 520 and 521, to permit the jury to convict a defendant as an aider abettor of first degree murder constitutes error. As the instructions given to the jury were erroneous insofar as they defined that theory of criminal liability, we decline to find a forfeiture. (*Hudson,* at p. 1012.)

18

(2) *The merits.*

Recently, the California Supreme Court decided *Chiu*. The issue in *Chiu* is the same issue raised here: "Does a conviction for first degree murder as an aider and abettor under the natural and probable consequences doctrine require that premeditated murder have been a reasonably foreseeable consequence of the target crimes or only that murder have been such a consequence?"

In *Chiu*, the California Supreme Court engaged in a discussion of the existing authorities pertinent to that theory of vicarious liability. It concluded "[f]irst degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty." (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 12].) The mental state for first degree murder is "uniquely subjective and personal"; it requires more than an intent to kill – the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that cause death." (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 12].), citations omitted.) "[W]hether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm." (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 12].) The victim is killed regardless of the aider and abettor's premeditative state. The court concluded that as a matter of policy, the direct perpetrator's premeditative state is too attenuated to impose vicarious liability on the aider and abettor for first degree murder under the natural and probable consequences doctrine. (*Chiu, supra*, __ Cal.4th at pp. __ [slip opn. at pp. 12-13].)

Accordingly, the court held that where the prosecution uses a target offense and the natural and probable consequences doctrine to allege a nontarget offense of murder, the only offense the aider and abettor commits is second degree murder. (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 13].) The punishment for second degree murder is commensurate with the aider and abettor's culpability for aiding and abetting the target crime. (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 13].)

19

The court further observed that the aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule. (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 13].) If the prosecutor wishes to obtain a conviction of first degree premeditated murder, he must proceed by using a theory of direct aiding and abetting in which a first degree murder is the target offense. (*Chiu, supra*, __ Cal.4th at p. __ [slip opn. at pp. 13-14].)

c. *Prejudice*

"Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; see also *Neder v. United States* (1999) 527 U.S. 1 [144 L.Ed.2d 35, 119 S.Ct. 1827].) Further, where there are alternate theories upon which the jury can find guilt, a reviewing court must conclude beyond a reasonable doubt that the jury based its verdict on a legally valid theory. (*Chun,* at p. 1203; see also *Chiu, supra*, __ Cal.4th at p. __ [slip opn. at p. 14].)

Our review of the record discloses no clue as to which theory or theories the jury may have used to reach a verdict of first degree murder. As the prosecution proceeded on two valid theories for conviction, but one erroneous theory, and this court cannot determine whether some or all of the jurors relied on the natural and probable consequences doctrine to reach a verdict, we must reverse appellant's conviction.

We adopt the same remedy as that used in *Chiu, supra*, __ Cal.4th at p. __ [slip opinion at page 16]. The instructional error here affected only the degree of the murder. Accordingly, we reverse the conviction of first degree murder, allowing the People to accept a reduction of appellant's conviction to second degree murder. However, if the People wish, they may retry appellant for an offense of first degree murder. If the People chose to retry the case, they may seek a first degree murder conviction on theories of first degree felony murder or on a theory of direct aiding and abetting.

4. *Prosecutorial Misconduct.*

Appellant contends that during closing comments, the prosecutor told the jury that each participant in the crime, whether a direct perpetrator or aider and abettor, is "equally guilty" of the offense committed. Appellant asserts the comments misstate the law and constitute reversible prosecutorial misconduct.

   a. *Background*

In his closing comments, in discussing appellant's guilt as an aider and abettor, the prosecutor claimed appellant knew an assault was likely if he stopped his minivan after the male pedestrian had "disrespected their territory." The prosecutor then argued the following.

"What is the expectation? I submit to you the expectation is this guy, if he says the wrong thing, is going to be assaulted. [¶] And what happens during an assault? Remember what [the deputy medical examiner] said when she showed you that portion of [the victim's] skull . . . . She says, 'We call it an eggshell, the skull [is] an eggshell because if you get a little crack here it can kind of splinter like an egg does when you hit the side . . . .' [¶] . . . [¶] . . . A co-participant, [Jonathan L.], committed the crime of murder. During the crime that the defendant was anticipating, go bang on that guy, go assault him, one of the people . . . there killed him. [Appellant] is responsible. *He is a principle under a theory of aiding and abetting to that crime. And principles are all equally guilty of the crime. The lookout, the getaway driver, the shooter, all the people involved in that crime are equally guilty*." (Complained-of comments italicized.)

Shortly thereafter, the prosecutor urged appellant "would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with a deadly weapon . . . ." The gang member protecting his turf, who had the bat in his minivan, would know when "hit[ting] this guy up" in a group beating could kill someone.

Then the prosecutor said the question the jury must address is whether a reasonably prudent person would foresee a murder. The prosecutor argued it was

21

reasonably foreseeable in the context of this dangerous Florencia 13 gang assault that the gang youths with appellant would kill "that guy" during the assault.

b. *The analysis*

(1) *Forfeiture.*

Trial counsel failed to object to the above comments. It is settled that to preserve a claim of prosecutorial misconduct, a defendant must seek a jury admonition or demonstrate on appeal that the admonishment would have been futile. (E.g., *People v. Blacksher* (2011) 52 Cal.4th 769, 829; *People v. Ledesma* (2006) 39 Cal.4th 641, 726.) In this case, a jury admonition would have cured any harm flowing from the prosecutor's comment implying an aider and abettor is always equally guilty with a direct perpetrator. Accordingly, the claim is forfeited.

(2) *The merits.*

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

Aiders and abettors are principles, but they are not always equally guilty with the direct perpetrator. (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 622-626; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165; *People v. Nero* (2010) 181 Cal.App.4th 504, 513-519.) As a result of the errors in the jury instructions, this court has ordered a reduction in the offense to second degree murder, or in the alternative, a retrial of appellant's liability for first degree murder. The order for a reduction in the judgment, or a retrial, has rendered the contention moot. However, if the People chose to retry the case, before the prosecutor makes the comment complained of here, he may wish to be certain that the "equally guilty" principle of law actually applies in this case.

5. *Cumulative error*

Appellant argues the cumulative errors in this record compel a reversal.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

As this court is reversing the judgment in part as explained above, there is also no need to reach this contention.

## DISPOSITION

The judgment is affirmed in part, reversed in part and remanded with directions. The judgment of first degree murder is reversed unless respondent accepts a reduction of the conviction to second degree murder. If, after the filing of the remittitur in the trial court, respondent does not bring defendant to retrial solely on the premeditation and deliberation element of murder within the time set forth in section 1382, subdivision (a)(2) – 60 days unless waived by the defendant – the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder and shall resentence appellant accordingly.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

KITCHING, J.

23